In March 1997, the Department of Human Resources ("DHR") in Covington County received a report concerning the possible sexual abuse of P.Z. by E.Z. (the "father"). Pursuant to a safety plan implemented by L.Z. (the "mother"), the father, and the Covington County DHR, P.Z. was placed in the custody of her paternal grandparents, F.Z. and O.Z. (the "paternal grandparents"); however, later that year, she was again residing with her parents, who had relocated to Jacksonville in Calhoun County. The Covington County DHR informed the Calhoun County DHR that the parents had violated the safety plan. On December 5, 1997, the Calhoun County DHR removed P.Z. from the home and placed her in foster care. The parents' *Page 334 
other two children, B.Z. and K.Z. (hereinafter referred to collectively, at times, as "the boys"), were also removed from the home because state law at the time prohibited them from residing in the same home with their father, who was a convicted sex offender, having pleaded guilty in 1991 to a statutory rape charge based on his sexual relationship with a 12-year-old girl.
The parents were at first allowed supervised extended overnight visits with all the children in the home of the paternal grandparents. However, those visits were discontinued based on reports by B.Z. and K.Z. that they were being touched inappropriately during visitation[1] and that they were sometimes left alone with the parents during visitation. The boys also reported that two persons they referred to as "John" and "Ann" had sexually abused them during visitation with the parents. The parents were then allowed supervised visitation with the children. DHR enrolled the parents in counseling with Wayne Hamberger, who placed the father in a sexual-offender course and addressed issues of marital stability with both parents.
In January 2000, DHR filed a petition to terminate parental rights. The case was placed upon the administrative docket pending the outcome of relative-placement investigations. In June 2001, the juvenile court held a termination trial; at the conclusion of the trial, the court entered a judgment terminating the parental rights of both the father and the mother. Both parents appeal.
 "The right to maintain family integrity is a fundamental right protected by the due process requirements of the Constitution. Pursuant to this right, Alabama courts recognize a presumption that parental custody will be in the best interests of a child. This prima facie right of a parent to custody of his or her child can only be overcome by clear and convincing evidence that permanent removal from the parent's custody would be in the child's best interests, but the primary consideration in any proceeding to terminate parental rights is always the best interests and welfare of the child. In making that determination, the court must consider whether the parent is physically, financially, and mentally able to care for the child. If the court finds from clear and convincing evidence that the parent is unable or unwilling to discharge his or her responsibilities to and for the child, his or her parental rights can then be terminated, pursuant to [Ala. Code 1975,] § 26-18-7(a). . . ."
Bowman v. State Dep't of Human Res., 534 So.2d 304, 305 (Ala.Civ.App. 1988) (citations omitted). A juvenile court's decision to terminate parental rights, which is based on evidence presented ore tenus, is presumed correct and will be reversed only if the record demonstrates that the decision is unsupported by the evidence and is plainly and palpably wrong. R.B. v. State Dep't of Human Res., 669 So.2d 187 (Ala.Civ.App. 1995).
To terminate parental rights, the juvenile court must first determine from clear and convincing evidence that the child or the children are dependent. S.F. v. Department of Human Res., 680 So.2d 346 (Ala.Civ.App. 1996). The court must then determine that there exists no alternative to termination. L.A.G. v State Dep't of Human Res., 681 So.2d 596
(Ala.Civ.App. 1996).
A court may terminate parental rights when "the parents of [the] child are unable or unwilling to discharge their responsibilities to and for the child" and "such conduct *Page 335 
or condition is unlikely to change in the foreseeable future." Ala. Code 1975, § 26-18-7(a). Sections 26-18-7(a)(1) through (6) and (b)(1) through(4) list the factors the juvenile court must consider in making the difficult decision whether to terminate parental rights. Among these factors are that reasonable efforts at rehabilitation of the parent have failed, § 26-18-7(a)(6), and that the parent has not exerted efforts to adjust his or her circumstances to the needs of the child in accordance with agreements reached with caseworkers. § 26-18-7(b)(4).
Several DHR caseworkers testified concerning the services offered to the family and the progress made by the family during the four years DHR was involved with the family. Tamantha Gibson was the family's caseworker from March 1997 to December 1998. She testified concerning the safety plan implemented for the family, which required P.Z. to live with the paternal grandparents. She explained that the children were placed in foster care in December 1997 because P.Z. was again living with her parents in violation of the safety plan and because the boys were not permitted to live in the home with the father because of the sexual-offender law in effect at the time.
Penny McGee was the family's caseworker from December 1998 to May 2000. She explained that the parents were required, pursuant to an individualized service plan (ISP), to notify DHR of residence changes, to maintain income sufficient to support the children, and not to transport the children by vehicle without supervision. According to McGee, the parents changed residences 3 times in 17 months without notifying DHR, and the father was unemployed for 4 months during that period. She also testified that the parents had, in violation of the ISP, transported the children in their own car without supervision. McGee also testified that the father had discussed inappropriate topics with the children; for example, when the father and the mother separated in July 1999, he told the children that the mother did not love him anymore and that she had left him, upsetting the children. She testified that, in February 2000, DHR had changed the case plan from one seeking reunification to relative placement or termination of parental rights.
Elaine Hubbard, the family's caseworker from August 2000 to February 2001, testified that the parents had severe relationship problems stemming from the mother's repeated infidelities. She said that the parents had divorced in December 2000 and that the father had relocated to Michigan because he felt he was codependent on the mother and that he needed to be away from her to "start over." She testified that she understood that they had reconciled upon the father's return from Michigan.
Hubbard also testified about DHR's exploration of relative resources. She explained that DHR had investigated the father's brother, who lived in Michigan, as a relative resource, but that he had never returned telephone calls. She stated that the parents were never stable enough as a couple to ensure the return of the children and that DHR had never considered the parents individually.
Gloria Craig, the family's caseworker from March 26, 2001, to the June 2001 termination trial, also testified concerning DHR's attempts to locate relative resources. She explained that the father's brother, Joe Kelly, was ruled unsuitable. She said that DHR had contacted several other possible resources, but that three possibilities had failed to reply to DHR's inquiries, that two had indicated that they did not wish to be involved with the family, and that the paternal grandparents had *Page 336 
health problems that precluded them as custodians. She explained that the parents had continued to visit with the children while she was the caseworker, but that DHR made no further efforts to reunify the family.
Dr. David Wilson, a psychologist, testified about his evaluations of the mother, father, and P.Z. He explained that the father suffered from a cognitive disorder, which resulted in problems with understanding and with impulse control. The mother, according to Dr. Wilson, is mildly mentally retarded because her full-scale IQ is 68. He also described the mother as a passive-dependent personality, which would indicate that she has a difficult time thinking for herself and making decisions. Dr. Wilson concluded that neither parent could function independently as an adequate parent to the children.
Dr. Wilson testified that P.Z. suffers from adjustment disorder with a depressed mood. He explained that she appears to believe that, if she does not tell anyone that something happened, it did not actually happen. Donna Crow, a licensed professional counselor who treated the children, also testified regarding P.Z. She explained that her sessions with P.Z. revealed strong indications that P.Z. had been sexually abused by her father, although P.Z. had repeatedly recanted, saying that she had lied because she was angry at her father.
Wayne Hamberger, a licensed professional counselor who treated the parents and supervised their visits with the children, also testified. According to Hamberger, the father had successfully completed his sexual-offender program. Although Hamberger denied that the father's sexual-offender status caused him concern over the father being with his own children, he testified that the father and the mother lacked the stability, both as to their relationship and financially, to parent the children effectively.
In Hamberger's opinion, the mother's ongoing relationships with other men and the father's response to those affairs posed a significant problem. He explained that the father inappropriately sought emotional support from his children when the mother left him or committed adultery. Hamberger further testified that the father would discuss inappropriate topics with the children; for example, he explained that the father had told the children that he had discovered the mother in bed with another man. The father, according to Hamberger, chose to meet the mother's needs and desires rather than to focus on the needs of the family as a whole. Specifically, Hamberger explained, the father would purchase the mother whatever she wanted in an attempt to make her happy, even if that meant sacrifice for the family. He also explained that he did not believe that the mother had the maturity level needed to effectively protect her children from harm.
The father is a disabled veteran. He receives $960 per month in veterans' disability benefits. He also testified that he worked at a Wal-Mart discount store for one year, at "Marvins" for six or seven months, and "just on and off jobs" during the four years DHR was involved with the family. He also testified that he lived in eight different residences during those years. He explained that he and the mother had financial difficulties because, at one time, his income was the only income for the family. He admitted that he had borrowed money from a pawnshop, that he had been behind in rent, and that he had been evicted once for nonpayment of rent.
The father denied that he had sexually abused his daughter. He admitted that *Page 337 
his sexual relationship with the 12-year-old girl was a "mistake," but testified that, at the time of the relationship, he was not aware that the relationship was illegal and commented that his "hormones had the best of" him. After admitting that he knew that the stability of his marriage was an important factor in the reunification plan, he stated that he had tried. He also said that, if the mother had another affair, he would not reconcile with her. When explaining why he went to Michigan after the parties' December 2000 divorce, he said that "I couldn't handle myself. I just had to get away," because of the divorce and his mother's death, which occurred in the same time frame.
The mother testified that she had had four affairs in as many years. She admitted that she knew her infidelity would likely impact her ability to be reunified with her children, but that she had not thought of it at the time she began each affair. She receives $530 per month in Social Security disability payments. Although she agreed that four years was sufficient time for her and the father to have achieved stability in their marriage and finances, she said that she thought that DHR should give them a few more months.
After reviewing the record, we conclude that the juvenile court's judgment terminating the parental rights of both the father and the mother is supported by the evidence at trial. While the parents certainly love the children, it is apparent that they are unable to maintain a stable lifestyle suitable for their children. The father's cognitive disorder and the mother's mild mental retardation restrict the ability of the parents to make reasoned decisions for the welfare of the family. Both Dr. Wilson and Mr. Hamberger opined that neither parent could adequately parent alone and that the parents' dysfunctional relationship prevented them from functioning adequately together as parents. The judgment terminating the parental rights of the mother and the father is affirmed.
AFFIRMED.
Yates, P.J., and Thompson, Pittman, and Murdock, JJ., concur.
[1] The record does not indicate the perpetrator of the alleged abuse during visitation.