J.D. ("the mother") appeals from a judgment terminating her parental rights to *Page 275 
her two-year-old daughter, J.M.D. We affirm.
The mother gave birth to J.M.D. on December 11, 2000. At the time of the child's birth, the mother and the child's biological father were not married. The mother was living with another man, J.D., whom she subsequently married. When the child was two weeks old, the Department of Human Resources ("DHR") received a report that the mother's home had no utilities. A DHR social worker investigated this report and found that the mother, the child, and J.D. were living in a mobile home with no electricity, no running water, and no septic tank.
Before the child was two months old, she had been hospitalized three times and diagnosed as a "failure-to-thrive" baby. The child was removed from the home on February 2, 2001. Social workers who visited the mobile home stated that it was unclean and that it was unsafe for a child. During an unannounced visit, the caseworker noted that the kitchen ceiling was collapsing, that there was a loaded handgun on the table, that there were "drop cords" everywhere (extension cords that connected the trailer to the electrical power source in a nearby mobile home belonging to J.D.'s parents), and that the home, which had several dogs and puppies, smelled of animal waste. The caseworker observed that the mother was inattentive to the child's needs.
The mother, who was 19 years old, told the caseworker that when she was pregnant with J.M.D. she was expecting twins, but, she said, the biological father had taken a knife and had "cut the other twin out of her." She stated that she received 60 stitches on that occasion. In checking out that story, the caseworker consulted the mother's obstetrician and the hospital in which J.M.D. had been born. The physician stated that there was no truth to the mother's story. He referred to a sonogram that indicated that the mother had never been pregnant with twins, and he verified the fact that the mother had been hospitalized during her pregnancy only for complications from nausea. The mother also told the caseworker that she had had another child, who would be about six years old, and whom, she claimed, she had given to a relative to rear. When the caseworker checked this story, she learned that the "other child" was the mother's four-year-old sister.
DHR developed an individualized service plan ("ISP") for the mother. The goals listed for the mother were visiting the child, having the mother's "emotional and mental needs met," and having the child "live in a safe and secure home free from neglect." DHR provided the mother with homemaker services, a psychological evaluation and mental health counseling, parenting classes, and anger-management classes. The mother made little or no progress in achieving the goals set for her at the ISP meeting. In February 2002, the mother moved to North Carolina to live with a relative. Before she left, she told the caseworker that she would give up her rights to J.M.D. so that the child could be adopted. On March 20, 2002, DHR moved to terminate the mother's parental rights.
The mother returned from North Carolina in April 2002. She and J.D. made some improvements to their mobile home, installed a septic tank, and obtained electricity. She completed parenting and anger-management classes and attended counseling sessions. The mother's counselor stated that she was "making an effort." The mother visited the child every week.
The hearing on the petition to terminate the mother's parental rights was conducted on June 19, 2002. The caseworker *Page 276 
acknowledged that the mother, after returning from North Carolina, had completed many of the ISP requirements. She testified, however, that the mother was still inattentive to the child and displayed inappropriate behavior with the child. The caseworker explained that the mother was easily frustrated and that she disciplined the child roughly for behavior that was to be expected of a toddler. For example, the caseworker said that, if the child wiggled while the mother was trying to feed or diaper her, the mother would "yank" the child's legs sharply. The caseworker also testified that, despite the improvements to the mother's mobile home, the residence was still unsafe for a child. The caseworker said the floors were dirty, and there were dangerous substances, such as cigarettes, alcohol, and nail-polish remover, left in places the child could reach.
At the time of the termination hearing, J.D. was receiving Supplemental Security Income ("SSI") benefits for a mental disability and the mother had just been fired from a job as a waitress that she had held for only two weeks. The family's total monthly household income was $545. The mother stated that she had previously received SSI benefits for being "a slow learner," and that she planned to reapply for SSI benefits.
DHR presented evidence about several relative resources it had considered and rejected as an alternative to terminating the mother's parental rights. The mother did not dispute the fact that there were no relatives who would be suitable.
The juvenile court's judgment states, in pertinent part:
 "The Court finds from clear and convincing evidence that is competent, material and relevant in nature that [J.M.D.] is a dependent child and that [DHR] has made lengthy and reasonable efforts toward reunification of said child with her mother. There has been no progress in alleviating or mitigating circumstances which necessitated placement of said child in foster care.
"The Court also finds that:
 "1. [The mother] has proved to be a very unstable young woman, both emotionally and mentally. [J.D.] is not a party to this action.
 "2. In spite of last minute efforts to finally try to comply with ISP recommendation, [the mother] has not demonstrated any skill whatsoever to achieve a trust and honest bond with the said child.
 "3. [The mother] has lied consistently to social workers and other professionals in their efforts to assist [her] in the reunification process.
 "4. Other than being indigent, it is clear that [the mother] does not have the maturity or stability to care for this said child. This is compounded by the fact that her spouse is mentally deficient and not able to provide any reliable assistance to help insure the health and safety of said child.
 "5. It appears convincing that [the mother] has a poor and distorted view of reality, judging by her total patterns of behavior since the inception of this action.
 "The Court has great fear that the safety and well-being of [J.M.D.] would be seriously compromised by placement with the said mother.
 "For the foregoing reasons and with other alternatives exhausted the Court finds that the petition to terminate parental rights is due to be granted."
When the State is the petitioner in termination proceedings, the trial court must apply a two-pronged test in determining whether to terminate parental *Page 277 
rights. First, the court must find from clear and convincing evidence that the child is dependent; second, the court must determine that there are no viable alternatives to the termination of parental rights. Exparte Beasley, 564 So.2d 950 (Ala. 1990). A trial court's decision in a proceeding to terminate parental rights, when based on ore tenus evidence, as here, is presumed correct and its decision will be set aside only if the record reveals that the decision is plainly and palpably wrong. M.J.G.L. v. State Dep't of Human Res., 587 So.2d 1004
(Ala.Civ.App. 1991).
Citing P.W. v. State Department of Human Resources, 822 So.2d 423
(Ala.Civ.App. 2001); V.M. v. State Department of Human Resources,710 So.2d 915 (Ala.Civ.App. 1998); and Bowman v. State Department ofHuman Resources, 534 So.2d 304 (Ala.Civ.App. 1988), the mother argues that the trial court's decision to terminate her parental rights was premature because the evidence indicated that the mother was making an effort to improve her living conditions and to comply with her ISP. In the three cases cited by the mother, the pivotal issues were: (1) whether DHR (and the trial court) had seriously considered the parent's recent efforts to adjust his circumstances to meet the needs of the child, seeBowman; V.M.; and, if so, (2) whether the parent's recent progress was substantial and consistent and, therefore, indicative of a willingness and ability to maintain that progress, or whether the parent's efforts were late, incomplete and, therefore, unconvincing, measures taken only in anticipation of the termination-of-parental-rights hearing, see P.W.
(a plurality opinion in which the members of this court were sharply divided on the issue).
This case is more like P.W. than it is like Bowman or V.M. Thus, in order to reverse the juvenile court's judgment, we would have to conclude that the evidence was not clear and convincing that the mother's recent efforts were late, incomplete, and therefore unconvincing measures taken only in anticipation of the termination-of-parental-rights hearing. In light of the juvenile court's findings, which are entitled to a presumption of correctness, we cannot reach that conclusion.
Those findings indicate that the juvenile court determined that the mother's progress toward achieving the goals for reunification was the result of "last-minute efforts" — efforts the court may have found unconvincing in light of its further finding that the mother "lied consistently to social workers and other professionals in their efforts to assist [her] in the reunification process." Moreover, it is apparent that the trial court determined that the mother was unable, because of emotional or mental problems, to adjust her circumstances to meet the needs of the child. The court found that the mother was "a very unstable young woman, both emotionally and mentally," that the mother "does not have the maturity or stability to care for th[e] child," and that the mother "has a poor and distorted view of reality."
The juvenile court's findings are supported by clear and convincing evidence and its decision based on those findings is due to be upheld. The judgment is affirmed.
AFFIRMED.
YATES, P.J., and THOMPSON, PITTMAN, and MURDOCK, JJ., concur. *Page 278