969 So.2d 918 (2007)
J.S.
v.
ST. CLAIR COUNTY DEPARTMENT OF HUMAN RESOURCES.
2051061.
Court of Civil Appeals of Alabama.
April 27, 2007.
Timothy Paul Wasyluka, Jr., of Wasyluka Law, LLC, Birmingham, for appellant.
Troy King, atty. gen., and Sharon E. Ficquette and Elizabeth L. Hendrix, asst. attys. gen., Department of Human Resources, for appellee.
THOMPSON, Presiding Judge.
On November 1, 2005, the St. Clair County Department of Human Resources ("DHR") filed a petition seeking to terminate the parental rights of J.S. ("the mother") to A.S., her five-year-old son. The mother answered. Following a hearing on *919 December 6, 2005, at which the trial court received ore tenus evidence, the trial court entered an order on July 28, 2006, terminating the mother's parental rights.[1] The mother timely appealed.
The evidence presented at the termination hearing revealed that the child had been born with a mild form of arthrogryposis, a debilitating birth defect resulting when a baby is born with multiple joints in a fixed position. The child's limitations as a result of the arthrogryposis include an inability to walk. The child requires physical therapy each day and undergoes occupational therapy once a week. The child requires 24-hour, supervised care.
In February 2003, the child was removed from the mother's custody by the Calhoun County Department of Human Resources and was placed in foster care as a result of allegations of domestic violence, neglect, and drug abuse. The child was later returned to the mother's physical custody in October 2003. In April 2004, DHR investigated reports that the mother was abusing drugs and not caring for the child in light of the child's special needs. As a result of that investigation, the child was removed from the mother's custody in April 2004.
Janet Salas, a DHR caseworker, testified that when she visited the mother to investigate the reports of drug abuse and neglect, the mother, who was living with her father at the time, tested positive for cocaine. Salas testified that the mother was unable to get out of bed and that she had hung towels over the windows in order to block sunlight from coming into the house. According to Salas, the house smelled of animal urine and feces.
The mother has a long history of drug abuse. The mother testified that she had abused drugs for approximately 10 years. The mother stated that she had used marijuana, cocaine, and methamphetamine. The mother explained that she would get high on drugs at night when the child was asleep. The mother testified that her last positive drug screen was in September 2005 when she tested positive for crack cocaine; however, other evidence indicated that the mother had tested positive for drugs on October 2005. The mother admitted that she had used crack cocaine over the course of the year preceding the final hearing after the child was removed from her custody. The mother testified that she had tried to participate in a rehabilitation program but was unsuccessful because she had no health insurance. The mother testified that she had been participating in Alcoholics Anonymous meetings during the three weeks preceding the termination hearing. The mother testified that she last used drugs in September 2005 and that she considered herself to be drug-free at the time of the December 6, 2005, termination hearing.
At the time of the termination hearing, the mother, who was then 38 years old, lived in a Salvation Army women's shelter. The mother had lived in the shelter since September 2005. The mother testified that she had nowhere else to go. The mother testified that she had her own room at the shelter and that living in the shelter offered her a "controlled" environment.
The mother testified that before living in the shelter she had been "jail hopping." According to the mother, she had been in and out of jail at least four times since April 2004, when the child was removed from her custody. The mother testified that she had been jailed at different times for possessing marijuana and drug paraphernalia, *920 for failing to appear on those possession charges, for negotiating a worthless negotiable instrument, and for charges stemming from the unauthorized use of a vehicle. The mother testified that the length of her stays in jail ranged from five days to three months. The mother testified that there were no outstanding criminal charges against her at the time of the termination hearing.
The mother testified that after her father died in July 2004 she was forced to move out of his house. The mother explained that she had no place to live from August 2004 to February 2005 but that she lived wherever she could find a place to lay her head. In February 2005, the mother lived at the Hannah Home, a group home for women and children, but she lost her bed there after she was incarcerated for five days. The mother testified that she then went to live with a friend for a couple of months before renting a hotel room in Anniston. After living in the hotel room, the mother was incarcerated again. The mother testified that, after her release from jail, she lived under overpasses and ate out of trash cans. The mother testified that she later stayed at a friend's house before being arrested for failing to appear on charges of drug possession.
The mother is a licensed cosmetologist. The mother testified that, at the time of the termination hearing, she was employed at the Personal Touch Hair Care Salon. The mother had worked for the salon for almost three months at the time of the hearing. The mother testified that she was earning a net income of $160 to $230 a week. The mother testified that she had not paid child support since the child had been in the custody of DHR, but she acknowledged that she had saved money from her employment as a cosmetologist. The mother explained that she had given toys, diapers, and clothes to the child's foster parents for the benefit of the child. In addition to the child, the mother has two children who are no longer in her custody. The record does not indicate whether the mother's parental rights to those children have been terminated.
The mother testified that DHR offered her parenting classes, drug counseling, and transportation. According to the mother, DHR offered to help her secure housing only if she remained employed for six months. On cross-examination, the mother testified that, at the time she asked for DHR's help to secure housing, she was employed but was abusing drugs. The mother admitted that she had not attended all the scheduled visitations with the child. The mother testified that she had successfully completed parenting classes. The mother agreed that it had been in the child's best interests to be in DHR's custody during the 20 months preceding the termination hearing because of her drug abuse and general instability. The mother testified that if the child had not been in the custody of DHR, the child would have stayed with his father during those times that the mother was in jail. The mother admitted on cross-examination that she had not started making strides towards reunification until September 2005  three months before the termination hearing.
Penny Walts, a former DHR caseworker, was the second caseworker assigned to the mother's case; Walts received the case on September 19, 2004. Walts testified that she held her first Individualized Service Plan ("ISP") meeting with the mother on November 9, 2004. According to Walts, the mother had not completed any of the goals set by DHR in the initial ISP.[2] *921 Walts testified that the mother had visited the child sporadically and that the mother had failed to complete parenting classes. Walts explained that the mother's problems were her drug abuse and her lack of stability.
Walts testified that the mother did not adjust her way of living to meet the needs of the child. Walts testified that she referred the mother to drug treatment but that the mother refused inpatient drug treatment. According to Walts, when she referred the mother for outpatient drug treatment at New Pathways, a drug-treatment facility, in November 2004, the mother did not attend until February 2005, and even then, Walts stated, the mother did not successfully complete the outpatient program.
Walts explained that it was hard to keep track of the mother. According to Walts, the mother had moved 21 times over the course of the 9 months that Walts worked on the mother's case. Walts testified that the rate at which the mother changed residences made it very difficult to locate the mother and to provide services for the mother's benefit.
Walts testified that she believed that it was in the child's best interest that the trial court terminate the mother's parental rights. According to Walts, given the mother's 10-year battle with drug addiction, two months of sobriety was not sufficient to demonstrate that the mother was truly drug-free. Walts testified that, of the 20 months that the child had been in DHR's custody, three months of living in a shelter was insufficient to demonstrate the mother's stability. Walts testified that she consistently asked the mother for names of potential relative resource placements at ISP meetings and that she explored those potential relative resources. According to Walts, the mother's immediate and extended family were unable to take care of the child.
Kimberly Green, a DHR employee, was assigned the mother's case in September 2005. Green testified that, at the time she received the case, the mother had made no changes to her lifestyle. Green testified that she held an ISP meeting with the mother and included gaining stability and obtaining housing in the mother's goals. According to Green, the mother had not contemplated drug rehabilitation. Green testified that she referred the mother to drug-treatment programs but that the mother was terminated from participation in the programs when she tested positive for marijuana, cocaine, and benzodiazepine. Green testified that the mother had tested positive for drugs in September 2005 and October 2005.
Green testified that she contacted numerous relative resource placements identified by the mother, some of which had been investigated earlier by Walts for potential placement of the child. According to Green, of the relative resources provided by the mother, some were physically incapable of caring for a child with disabilities and others declined to take care of the child because of his disability.
Green explained that since DHR had filed its petition to terminate the mother's parental rights, the mother had started attending drug counseling. Green testified that in September 2005 the mother began paying $109 per month in child support and $28.50 towards her child-support arrearage. Green stated that the mother had only missed one supervised visit with the child in the three months preceding the termination hearing. Green believed that it was in the child's best interests to terminate the mother's parental rights. *922 Green testified that the child needed stability and that she did not foresee the mother changing her cycle of behavior to accommodate the child's needs. Green noted the mother's recent improvement, but she believed that any improvements made by the mother would be short-lived.
The mother contends on appeal that the trial court abused its discretion by terminating her parental rights. With regard to reviewing a case that involves the termination of parental rights, this court has held:
"A juvenile court is required to apply a two-pronged test in determining whether to terminate parental rights: (1) clear and convincing evidence must support a finding that the child is dependent; and (2) the court must properly consider and reject all viable alternatives to a termination of parental rights. Ex parte Beasley, 564 So.2d 950, 954 (Ala.1990). A juvenile court's decision to terminate parental rights, which is based on evidence presented ore tenus, is presumed correct and will be reversed only if the record demonstrates that the decision is unsupported by the evidence and is plainly and palpably wrong. R.B. v. State Dep't of Human Res., 669 So.2d 187 (Ala.Civ.App.1995)."
B.M. v. State, 895 So.2d 319, 331 (Ala.Civ. App.2004). See also T.C. v. Cullman County Dep't of Human Res., 899 So.2d 281 (Ala.Civ.App.2004); and E.Z. v. Calhoun County Dep't of Human Res., 828 So.2d 332 (Ala.Civ.App.2002).
Section 26-18-7, Ala.Code 1975, sets forth the statutory authority for the termination of parental rights. That section provides, in pertinent part:
"(a) If the court finds from clear and convincing evidence, competent, material, and relevant in nature, that the parents of a child are unable or unwilling to discharge their responsibilities to and for the child, or that the conduct or condition of the parents is such as to render them unable to properly care for the child and that such conduct or condition is unlikely to change in the foreseeable future, it may terminate the parental rights of the parents. In determining whether or not the parents are unable or unwilling to discharge their responsibilities to and for the child, the court shall consider, and in cases of voluntary relinquishment of parental rights may consider, but not be limited to, the following:
"(1) That the parents have abandoned the child, provided that in such cases, proof shall not be required of reasonable efforts to prevent removal or reunite the child with the parents.
"(2) Emotional illness, mental illness or mental deficiency of the parent, or excessive use of alcohol or controlled substances, of such duration or nature as to render the parent unable to care for needs of the child.
"(3) That the parent has tortured, abused, cruelly beaten, or otherwise maltreated the child, or attempted to torture, abuse, cruelly beat, or otherwise maltreat the child, or the child is in clear and present danger of being thus tortured, abused, cruelly beaten, or otherwise maltreated as evidenced by such treatment of a sibling.
"(4) Conviction of and imprisonment for a felony.
"(5) Unexplained serious physical injury to the child under such circumstances as would indicate that such injuries resulted from the intentional conduct or willful neglect of the parent.
"(6) That reasonable efforts by the Department of Human Resources or licensed public or private child care *923 agencies leading toward the rehabilitation of the parents have failed.
"(7) That the parent has been convicted by a court of competent jurisdiction of any of the following:
". . . .
"(8) That parental rights to a sibling of the child have been involuntarily terminated.
"(b) Where a child is not in the physical custody of its parent or parents appointed by the court, the court, in addition to the foregoing, shall also consider, but is not limited to the following:
"(1) Failure by the parents to provide for the material needs of the child or to pay a reasonable portion of its support, where the parent is able to do so.
"(2) Failure by the parents to maintain regular visits with the child in accordance with a plan devised by the department, or any public or licensed private child care agency, and agreed to by the parent.
"(3) Failure by the parents to maintain consistent contact or communication with the child.
"(4) Lack of effort by the parent to adjust his or her circumstances to meet the needs of the child in accordance with agreements reached, including agreements reached with local departments of human resources or licensed child-placing agencies, in an administrative review or a judicial review."
The mother argues on appeal that DHR failed to demonstrate that she would be unable to care for the child in the foreseeable future. The mother suggests that the trial court disregarded the improvements she had made in the three months before the termination hearing when it determined that her parental rights were due to be terminated. She asserts that the termination of her parental rights was premature.
At the time of the hearing in this matter, the child had been in the custody of DHR for 20 months. During that time, the mother had been in and out of jail and had lived wherever she could. The mother regularly used illegal drugs. The mother admitted to continuing to use drugs even after DHR removed the child from her custody. The mother continued to use drugs even after DHR, with the goal of reunification, had developed an ISP requiring the mother to stop using drugs in order to regain custody of the child. DHR provided the mother with several referrals for drug treatment, but the mother did not respond to DHR's request that she seek treatment for her drug addictions. The mother continued to use illegal drugs until two to three months before the termination hearing.
Over the course of the 20 months that the child was in DHR's custody, the mother, with the knowledge that one of the goals set by DHR in its ISP was for her to gain stability and to secure housing, changed residences 21 times. At the time of the hearing, the mother was living in a shelter. The mother's testimony revealed that she had no immediate plans to leave the shelter and secure housing of her own.
In this case, the mother failed to make a consistent effort to meet the goals set forth by DHR. In her brief on appeal, the mother acknowledges her failure to fully comply with the goals set by DHR, stating that her "compliance may not have been ideal, or overall complete to a point where the court should have returned [the child] to her custody, but [the mother's] compliance was marked, and not refuted by DHR's evidence." The mother further states that, "[a]lthough [she] did not complete all of DHR's requirements, her ability *924 to reform after her last time in prison demonstrates a likelihood that she would change her circumstances." (Emphasis added.)
Multiple witnesses testified at the termination hearing that the child needed stability. The child suffers from a debilitating birth defect and requires consistent care. DHR made this need for stability clear to the mother when it developed an ISP for her that included goals of finding stable housing, maintaining stable employment, and ending her drug use. The mother's suggestion on appeal that her recent, minimal compliance with DHR's requirements demonstrates the likelihood that she will change her circumstances in the future is unsupported by the evidence; rather, the evidence indicates that the mother learned very little from her involvement with DHR. The evidence supports the conclusion that the mother demonstrated an inability to care for the child in the foreseeable future. Given the evidence presented at the termination hearing, we cannot say that the trial court abused its discretion by terminating the mother's parental rights.
The mother also contends on appeal that the termination of her parental rights was error given DHR's failure to establish that no viable alternatives to the termination of her parental rights existed. Specifically, the mother contends that DHR failed to establish by clear and convincing evidence that continuing the child's placement in foster care and allowing the mother to continue her visitation with the child was not a viable alternative to the termination of her parental rights. The mother also suggests that DHR failed to address the possible placement of the child with the mother's oldest son, M.B.
The mother argues on appeal that placement of the child with her oldest son, M.B., was a viable alternative to the termination of her parental rights. The mother maintains that she informed DHR that she had an older son, that DHR should have known that the son was nearing the age of majority and, thus, that M.B. could have been considered as a relative resource for the placement of the child. The record on appeal does not support the mother's assertion that DHR knew that M.B. was reaching the age of majority, and that M.B. could be considered a relative resource for the child.
The evidence that the mother suggests was presented to the trial court is not contained in the record on appeal. "This Court is bound by the record, and the record may not be impeached by matters outside the record, such as allegations included in the appellant's brief." Coleman v. Taber, 572 So.2d 399, 401 (Ala. 1990); see also Wal-Mart Stores, Inc. v. Goodman, 789 So.2d 166, 176 (Ala.2000). The mother's testimony regarding M.B. is limited to his existence; there is no testimony regarding his age or his potential as a relative resource placement for the child. Further, the mother did not invoke Rule 10(f), Ala. R.App. P., which provides for the modification of the record on appeal when material is omitted from the record. Therefore, we will not consider the mother's argument regarding DHR's purported failure to consider M.B. as a potential relative resource for the placement of the child. The mother has not demonstrated that the trial court erred by finding that no viable alternatives existed to the termination of her parental rights.
The mother compares her situation to that of the mother in our supreme court's recent decision in Ex parte T.V., [Ms. 1050365, Jan. 12, 2007] ___ So.2d ___ (Ala.2007), in support of her argument that her current circumstances do not warrant the termination of her parental rights. However, the facts supporting the mother in Ex parte T.V. are distinguishable from *925 the facts in the instant case. In Ex parte T.V., DHR received custody of T.V.'s child in 1999 amid allegations that T.V. was addicted to drugs, unemployed, incarcerated, and homeless. ___ So.2d at ___. However, by 2004, when the petition to terminate T.V.'s parental rights was filed, T.V. had made "progress" and had "met the goals DHR originally set for her" as part of an ISP. ___ So.2d at ___. At the time of the termination hearing, T.V. was no longer homeless, had married the father of the child, had been both drug-free and regularly employed for almost two years, and had contributed to the support of the child.
In the instant case, the mother admits on appeal that she did not meet the goals DHR set for her as part of her ISP. Unlike the mother in Ex parte T.V., the mother in this case waited until three months before the termination hearing to begin working towards reunification with the child. The mother did not make significant progress over the course of the 20 months that the child was in DHR's custody.
We cannot agree with the mother's position that the trial court erred by not allowing the child to remain in DHR's custody for however long it would take the mother to meet the goals DHR had set for her. This would only serve the mother's best interests and not those of the child. "It is the consideration of the best interests of the child that lies at the heart of every proceeding to terminate parental rights. L.G. [v. State Dep't of Human Resources, 603 So.2d 1100 (Ala.Civ.App. 1992)]." H.M.W. v. Mobile County Dep't of Human Res., 631 So.2d 1049, 1050 (Ala. Civ.App.1993). Therefore, we affirm the judgment of the trial court.
AFFIRMED.
PITTMAN, BRYAN, and MOORE, JJ., concur.
THOMAS, J., concurs specially.
THOMAS, Judge, concurring specially.
I concur in affirming the judgment terminating the mother's parental rights. Because the mother compares her situation to that of the mother in Ex parte T.V., [Ms. 1050365, January 12, 2007] ___ So.2d ___ (Ala.2007), and because she argues that her current circumstances do not warrant the termination of her parental rights, I take this opportunity to explain how I believe T.V. should be interpreted, why this mother's circumstances are different from those in T.V., and how cases involving a parent's "recent progress" should be analyzed.
In T.V., the mother was a former unemployed, homeless, crack cocaine addict who arguably had, abandoned her child before DHR petitioned to terminate her parental rights. DHR had had grounds to terminate the mother's parental rights four years earlier, but it had declined to do so. By the time the termination petition was heard, however, the mother had completely turned her life around. She had not only conquered her drug addiction but had also begun to counsel others to avoid drugs; she was married, gainfully employed, and active in her church. When DHR's termination petition was heard, there were, quite simply, no grounds for termination of T.V.'s parental right. When the termination petition was heard in the present case, the mother had made recent progress in meeting some of the goals set for her in the ISP, but DHR had grounds for termination of the mother's parental rights because the mother had not met all the goals set out for her.
When the evidence indicates that a parent has made recent progress toward improving the conditions that led to the *926 child's becoming dependent, and the parent argues that DHR's decision to terminate parental rights is unwarranted or premature because, the parent says, his or her recent progress indicates that he or she is capable of achieving reunification with the child, the juvenile court should determine
"whether the parent's recent progress [is] substantial and consistent and, therefore, indicative of a willingness and ability to maintain that progress, or whether the parent's efforts [are] late, incomplete and, therefore, unconvincing, measures taken only in anticipation of the termination-of-parental-rights hearing."
J.D. v. Cherokee County Dep't of Human Res., 858 So.2d 274, 277 (Ala.Civ.App. 2003). See also V.O. v. State Dept. of Human Res., 876 So.2d 1151, 1157 (Ala. Civ.App.2003); P.W. v. State Dep't of Human Res., 822 So.2d 423 (Ala.Civ.App. 2001); V.M. v. State Dep't of Human Res., 710 So.2d 915 (Ala.Civ.App.1998); L.A.G. v. State Dep't of Human Res., 681 So.2d 596 (Ala.Civ.App.1996); and Bowman v. State Dep't of Human Res., 534 So.2d 304 (Ala.Civ.App.1988).
Because the record supports a determination that this mother's recent progress was only partial and was begun only three months before the termination-of-parental-rights hearing, the juvenile court was authorized to find that the mother's efforts were "late, incomplete and, therefore, unconvincing, measures taken only in anticipation of the termination-of-parental-rights hearing." J.D. v. Cherokee County Dep't of Human Res., 858 So.2d at 277.
NOTES
[1] The trial court also terminated the parental rights of K.S., the child's legal father; however, K.S. did not appeal the termination of his parental rights.
[2] The record indicates that DHR held the first ISP meeting with the mother on May 19, 2004; however, the specific goals identified in that ISP were not discussed at the termination hearing.