S.K. ("the mother") and J.K. ("the father") appeal from judgments entered by the Jackson Juvenile Court on July 3, 2007, terminating their parental rights to M.K. and A.K. ("the children").[1] We reverse and remand.
 The Facts
The mother gave birth to M.K. on January 13, 2004, and to A.K. on November 17, 2004. In the interim, the Jackson County Department of Human Resources ("DHR") initiated protective-services proceedings regarding the family for reasons unstated in the record. On January 18, 2005, Yvonne Woods, the DHR caseworker assigned to the family, informed the parents that they needed to start parenting classes and counseling. Woods also instructed the parents that the father needed to find a steady job. The mother stated that she could not attend the classes until she dealt with some health problems.
Less than two weeks later, DHR received a report indicating that the father had committed an act of domestic violence against the mother. Woods thereafter recommended that the parents undergo domestic-violence counseling and that they receive the assistance of a case aide in the home. The mother originally agreed to domestic-violence counseling, but on February 1 and 2, 2005, the mother telephoned Woods to notify DHR that she had dropped her domestic-violence complaint against the father. According to Woods, the mother requested that DHR cease its involvement with the family and the mother also refused to allow the case aide to enter the home.
On February 2, 2005, DHR filed a petition for shelter-care custody of the children. The juvenile court awarded shelter-care custody of the children to DHR, and Woods took the children into custody later that same afternoon. According to the children's maternal great-grandmother, DHR transferred custody of the children to S.W. ("the foster mother") that night.
By April 2005, the parents seemed to be cooperating better with DHR. The parents had initially visited with the children for only one hour per week under the supervision of DHR and/or the foster mother, but, on March 22, they began unsupervised visits for up to four hours. The parents commenced domestic-violence counseling with Janet Sage.[2] The parents also started family counseling with Lisa Rorex Fountain on March 13, 2005, to improve their parenting, communication, and discipline skills; they were compliant with the program and seemed to be progressing after three sessions. The father obtained a job at "Shaw," and the mother told Woods she had started working at "Ruby Tuesday's."
However, on April 8, 2005, the mother reported that the father had committed another act of domestic violence against her. About 10 days later, the parents moved into a new home in Bridgeport. After moving, the parents requested, and DHR agreed to, assistance with paying their electric bill and meeting their gas needs. At that point, they stopped attending *Page 18 
counseling and did not contact Fountain or Sage further. Both Fountain and Sage testified that the parents had not completed counseling and that the parents had not been referred to alternative counseling. Fountain estimated that her counseling would not have ended for 8 months, while Sage testified that her domestic-violence counseling was intended to last 16 weeks.
On May 3, 2005, DHR ended the four-hour visits. On May 19, 2005, M.K. under-went surgery to have tubes placed in his ears. Woods testified that the mother had told her at that time that she intended to leave the father and that she intended to ask Sage for help to get situated after they separated. Woods testified that, following M.K.'s surgery, the parents lost contact with DHR. The mother testified that she and the father had left their new house. The mother then moved into a domestic-violence shelter where she stayed from June 30, 2005, to July 21, 2005. The father stated that he had left the Bridgeport house because he had a new job hauling granite for "Graystone" that required him to travel. The father contacted Woods on July 18, 2005, to tell her that he was out of town and that he planned on divorcing the mother.
On or around July 21, 2005, the mother moved into the home of N.B., a man she had met through a friend one week earlier. N.B. was a long-haul truck driver. From July 21 until late November 2005, N.B. provided for the mother while the mother stayed home and took care of his two children. The mother eventually indicated her intent to marry N.B. and discussed with DHR the possibility of the children moving in with her and N.B.
However, over the Thanksgiving holiday, the mother reconciled with the father during a shared visitation. The mother moved out of N.B.'s house and moved into a trailer in Flat Rock. The mother asked DHR to halt any efforts to conduct a home study on N.B. in light of her move. The mother testified that she and the father had subsequently moved in together into an apartment in South Pittsburg, Tennessee, in December 2005. Woods testified that DHR did not learn that the parents had reconciled until later.
The mother reentered a domestic-violence shelter on January 5, 2006, once again to escape the father. The mother testified that the father had kicked her in the abdomen while he was lying on the couch with his feet resting in her lap. The father had kicked the mother after the mother informed the father that she was pregnant and while the two were discussing the paternity of the child. An employee of the domestic-violence shelter reported that the mother had telephoned a hotline and had reported that the father had threatened to throw her out of a moving vehicle after she informed him that she was pregnant with N.B.'s child. The mother stayed in the shelter for three days before moving to another shelter in north Georgia after a man fitting the father's description showed up at the shelter seeking the mother.
On January 12, 2006, the mother informed Woods that she was living in a domestic-violence shelter. The mother indicated at that time that she wanted the foster mother to adopt the children. The mother then discussed with the foster mother and Woods about obtaining public housing. The mother telephoned Woods on January 24, 2006, to inform DHR that she had once again changed domestic-violence shelters in order to elude the father. The mother signed papers consenting to the termination of her parental rights on February 1, 2006, so that the foster mother could proceed with adopting the children. *Page 19 
The mother testified that she had moved into the New Life Maternity Home ("the Home") in Cleveland, Tennessee, around this time. The Home incorporated strict rules for its residents, including a requirement that the residents attend Bible school from 8:30 a.m. to noon and that victims of domestic violence attend a support-group meeting on Monday nights. The mother complied with those restrictions. The mother testified that, during her stay at the Home, she had experienced a spiritual reawakening. The mother testified that she had "learned what God has done for us" and that she had "built a relationship with [God]"; since that time, she said, everything that she does is "based on" God. Marti Dayton, the housemother at the Home, testified that she believed the mother was sincere in the pursuit of her biblical study at the Home. On March 6, 2006, the mother revoked her prior consent to termination of her parental rights because she believed God did not want her to lose the children. The juvenile court authorized the revocation.
While the mother was in the Home, the father spent time in the Marion County and Jackson County jails. He was jailed in Marion County for failing to pay a speeding ticket and for failing to appear for court. The authorities then moved him to Jackson County because of his failure to contact his probation officer. The father was on probation from an earlier domestic-violence conviction. Woods visited the father in jail. Woods testified that her jail visit was the first contact she had had with the father in six or seven months. The father told Woods that he had been out of town, that he had not seen the mother, that he had not impregnated the mother, that he had a girlfriend, that he intended to divorce the mother, that he did not consent to a termination of his parental rights, and that he had relatives, namely his aunt and uncle, who could take care of the children.[3]
The foster mother testified that the father had never called about the children when he was out of town. The father claimed that he had not had access to a telephone while working. The father also failed to visit the children at all for six months. The foster mother also testified that the mother had missed several visits when she had been living with N.B. The foster mother estimated that overall the mother had missed about one-third of the visits and the father had missed far more. The foster mother admitted, however, that she had scheduled the visits for Friday mornings when the father was working and that she would not arrange for any weekend visits because that is when she spent time with the children.
On April 6, 2006, the juvenile court held another hearing. At that time, the juvenile court authorized DHR to file petitions to terminate the parents' parental rights and DHR terminated all services. The parents subsequently talked at the court-house and decided that they would try to work things out for the sake of the children and the unborn child. The mother moved out of the Home on April 10, 2006, and moved with the father into an apartment in a housing project in South Pittsburg.
In June 2006, the parents moved back to Bridgeport where the father had started a new job at "Heat International." Woods testified that DHR had first learned on June 1, 2006, that the parents had reunited in April 2006. The mother gave birth to *Page 20 
the baby on August 11, 2006. No paternity test has been undertaken, but the mother testified that the baby is definitely the father's based on the resemblance between the two.
The parents moved into a mobile home in Jasper, Tennessee, in September 2006. The father took a job as a driller helper with "Tri-State Drilling Testing"; the mother stayed at home to care for the baby. They signed a one-year lease and the mother testified that they had no plans to relocate.
On October 6, 2006, DHR filed the petitions to terminate the mother's and the father's parental rights. Woods, the foster mother, and the children visited the parents' Jasper home around that same time. The mother, the children's maternal great-grandmother, and the baby were present. Woods observed the home and found it to be safe and suitable for the baby. Woods also found the baby to be "just fine." Woods testified that she had had no safety concerns for the baby that would have warranted removing the baby from the custody of the parents. The parents' landlord, a foster parent himself, also testified that he had observed the parents and found them to be suitable and loving parents to the baby, as well as good tenants. However, Woods also testified that the fact that the parents could properly care for the baby did not mean that they could properly care for the children.
In November 2006, the Tennessee counterpart to DHR investigated the parents' home based on an anonymous report that the parents were using drugs in front of the baby and were neglecting the baby. According to the mother, those allegations had proved unfounded and no adverse action had been taken against the parents.[4]
The parents started undergoing faith-based counseling through their pastor in the fall of 2006, attending about 20 one-hour sessions; those sessions took place on Saturdays. The mother testified that DHR had approved that counseling as being compliant with a previous juvenile court order requiring them to complete counseling. Mary Nixon, the child-welfare supervisor for DHR, testified that she did not recall telling the mother that the pastoral counseling would suffice for the counseling requirements of the court; rather, she testified that she had made a list for the mother of the issues that had been identified by the psychological assessment taken by DHR as issues that the parents needed to address. Nixon testified that she had given the mother the list with the understanding that the faith-based counseling would be in addition to the counseling that had been ordered by the court.
The parents' pastor admitted that he had no specialized training in counseling, but he believed the parents had made progress addressing the issues raised by DHR. The pastor described the parents' marriage as "mending." Fountain testified that counseling would work only if the parents put into practice the proper techniques they had learned. Fountain also testified that it would be difficult to gauge the success of counseling because the father spent all week out of the house working and spent only weekends with the family. However, the pastor and the parents testified that the parents had successfully adopted safe anger-management practices and that they had learned how to communicate their needs to one another without domestic violence. The mother attended *Page 21 
church often, and the father attended most Sunday services.
The children's maternal great-grandmother testified that she believed the mother and the father had changed dramatically. The maternal great-grandmother testified that she believed the mother had been aggressive and had needed counseling since she was a teenager but that the mother had transformed into a peaceful and loving parent. The maternal great-grandmother also felt that the father had matured. The maternal great-grandmother testified that she had often visited the parents and had seen no signs of domestic violence or anger-management problems. The maternal great-grandmother also stated that she had sided with the children's maternal grandmother in 2004, when the maternal grandmother had taken M.K. from the mother after DHR had initiated proceedings regarding the family, but that she now felt that the mother and the father could properly care for the children.
The mother testified at the January 25, 2007, termination hearing that, since April 2006, the parents had overcome all the problems that had caused DHR to remove the children from their care. The mother admitted that the parents had moved an excessive number of times, but she stated that they had now found a stable home. The foster mother agreed that the parents seemed more stable since April 2006. According to the mother, the children had never seen any of the domestic violence between her and the father, but they had been in the home when the domestic violence had occurred. The mother testified that the parents now enjoyed a good marriage without domestic violence. The foster mother concurred that the parents no longer engaged in domestic violence.
At the time of the termination hearing, the parents also were better off financially. The mother testified that she had determined that the parents could afford to care for the children without her having to work. However, the mother admitted that, except for clothing, presents, and toys, the parents had not provided any child support for the children and owed over $6,000 in back child support. They had $1,000 saved.
The mother also testified that they were regularly visiting with the children, having missed only one visit in December 2006. The foster mother testified that, when the parents visited with the children, the father was gentle and was interested in the children but that the mother had not been able to bond with A.K.
Woods testified that the parents had completed parenting classes but that the father had never completed domestic-violence counseling. The father testified that he had completed domestic-violence counseling and an anger-management program as part of his probation. The father testified that he had been baptized and that he no longer cursed, drank alcohol, or exhibited a short temper. He stated that he communicates with the mother regarding their problems, or, if he finds things getting to be too much, he goes for a long walk in the woods behind their home. The father feels he has benefited from the Christian counseling he has been receiving.
 The Juvenile Court's Judgments
On July 3, 2007, the juvenile court issued judgments terminating the parental rights of the mother and the father as to both children. Those judgments both stated, in pertinent part:
 "The Court finds from clear and convincing evidence that the child remains dependent in that the parents have consistently failed to responsibly discharge their parental responsibilities to and for the child and that there is no reason for *Page 22 
the Court to believe that this will change in the future.
 "Specifically the Court finds the following:
 "1. The parents have contributed little or no support for the child while he has been in foster care. Support has been limited to a few articles of clothing and some toys.
 "2. The parents have not cooperated with the Jackson County Department of Human Resources in accepting reunification services. They failed to avail themselves of Family Options assistance and other counseling services offered.
 "3. The parents have made at least ten changes of residency while the child has been in the custody of [DHR] and the mother has sought refuge in domestic violence shelters on at least eight occasions. All of which has greatly hindered the delivery of reunification services.
 "4. The parents have failed to complete domestic violence counseling and failed to complete the counseling set out in the [individualized service plan]. The father readily admits that he has engaged in violence toward the mother.
 "5. The father of the child has failed to maintain steady employment in that he has had at least six jobs while the child has been in foster care. Most of these jobs he either quit or was terminated by his employer.
 "6. There has been a lack of consistent visitation with the children with the mother missing at least a third of the scheduled visits and the father considerably more.
 "7. Both parents have engaged in extramarital affairs, with the mother becoming pregnant by another man and reportedly having an abortion.
 "8. While their latest landlord testified that the parents were good renters they have abandoned some of their previous residences with a rental balance due with substantial damage done to the premises.
 "The Court finds that the Jackson County Department of Human Resources has investigated all viable alternatives to the termination of parental rights and that no viable alternatives exist. There are no suitable relative resources for the placement of the child at this time and the Court finds the Department of Human Resources has made a diligent search for same.
 "The Court finds that the Jackson County Department of Human Resources has gone above and beyond the call of duty in attempting to provide reunification services. The parents have shown no consistent effort to be reunified with their child and have consistently failed to be truthful with those attempting to provide services.
 "The Jackson County Department of Human Resources has a permanency plan for the child which would be adoption. The Court approves said plan and finds it to be in the best interest of the child."
Both the mother and the father timely appealed to this court.
 Issue
The parents raise multiple issues on appeal, but we address only the issue whether the record contains clear and convincing evidence of grounds for termination; we find the resolution of that issue to be dispositive.
 Analysis
In order to terminate parental rights in an action brought by a state agency, a juvenile court must find clear and convincing evidence of grounds for *Page 23 
termination. Ex parte Beasley, 564 So.2d 950, 952
(Ala. 1990). The statutory grounds for termination are contained in Ala. Code 1975, § 26-18-7, which provides, in pertinent part:
 "If the court finds from clear and convincing evidence, competent, material, and relevant in nature, that the parents of a child are unable or unwilling to discharge their responsibilities to and for the child, or that the conduct or condition of the parents is such as to render them unable to properly care for the child and that such conduct or condition is, unlikely to change in the foreseeable future, it may terminate the parental rights of the parents."
Ala. Code 1975, § 26-18-7(a). The statute speaks in present and future terms. Thus, a juvenile court may terminate parental rights only if clear and convincing evidence proves that the parents are currently unable to properly parent the children,see D.O. v. Calhoun County Dep't of Human Res.,859 So.2d 439, 444 (Ala.Civ.App. 2003), or that the conduct or condition of the parents is such as to render them presently unable to care for the children and that such conduct or condition will probably prevent them from properly caring for the children in the foreseeable future. See D.M. v. WalkerCounty Dep't of Human Res., 919 So.2d 1197, 1211
(Ala.Civ.App. 2005). However, a juvenile court may consider the past history of a parent in making its determination as to the likelihood that the improper parental conduct or condition will recur in the foreseeable future. See generally Ex parteState Dep't of Human Res., 624 So.2d 589, 593 (Ala. 1993) ("A court may consider the past history of the family, as well as evidence of its present conditions.").
In their briefs, DHR and the children's guardian ad litem emphasize that the past circumstances of the family support the juvenile court's ultimate decision to terminate the parents' parental rights. On the other hand, the parents maintain that their circumstances leading up to and at the time of the termination hearing demonstrate that they are now proper parents and will remain so.
The evidence presented by the parents suggests that the parents have been totally rehabilitated. The father completed domestic-violence classes through a separate court-referral program and both parents have received counseling through their pastor. According to the parents, through these programs and their renewed faith in God, by the time of the termination hearing the father had learned how to control his temper and the parents had learned how to resolve their differences appropriately. The mother testified, and all the other witnesses testifying on the subject agreed, that the father had not committed any acts of domestic violence since the parties reunited in April 2006.
The evidence further showed that the father had found stable employment that provided the parties sufficient income to care for all three children and that the parents had settled into a suitable and stable residence. The parents' landlord, a disinterested witness with little knowledge of the past history of the parents, observed them to be good and caring parents during the five months before the termination hearing. The children's maternal great-grandmother, once antagonistic to the parents, testified that they had made a dramatic turnaround such that she felt confident that they could properly raise the children by the time of the hearing. Even the foster mother testified that the parents seemed more stable since they had moved to Jasper, although she would not concede that they were capable of properly raising the children. Neither DHR nor the Tennessee authorities have taken any action to *Page 24 
remove the third child from the care of the parents.
In cases like these, the juvenile court must seriously consider the parents' recent efforts to adjust their circumstances to meet the needs of the children and must also consider
 "whether the parent's recent progress was substantial and consistent and, therefore, indicative of a willingness and ability to maintain that progress, or whether the parent's efforts were late, incomplete and, therefore, unconvincing, measures taken only in anticipation of the termination-of-parental-rights hearing."
J.D. v. Cherokee County Dep't of Human Res.,858 So.2d 274, 277 (Ala.Civ.App. 2003). In its judgments, the only mention of the parents' current circumstances is a reference to the landlord's testimony that the parents were "good renters." The juvenile court further did not explicitly state that it found the parents' rehabilitation efforts to be insubstantial or inconsistent. Even if that finding may be implied, seeDM., 919 So.2d at 1210 ("In the absence of specific factual findings, this court must assume that the trial court made those findings necessary to support its judgment"), that implicit finding must be supported by clear and convincing evidence. However, DHR presented no evidence to contradict the parents' version of their circumstances existing after April 2006.
The termination of parental rights is an extreme matter and is not to be considered lightly. Ex parte Beasley,564 So.2d at 952. "Inasmuch as the termination of parental rights strikes at the very heart of the family unit, a court should terminate parental rights only in the most egregious of circumstances." Id. By statute, parental rights may only be terminated based on "clear and convincing evidence." See Ala. Code 1975, § 26-18-7(a). "Clear and convincing evidence" is "`[e]vidence that, when weighed against evidence in opposition, will produce in the mind of the trier of fact a firm conviction as to each essential element of the claim and a high probability as to the correctness of the conclusion.'"L.M. v. D.D.F., 840 So.2d 171, 179 (Ala.Civ.App. 2002) (quoting Ala. Code 1975, § 6-11-20(b)(4)). The record before us does not contain clear and convincing evidence establishing that at the time of the termination hearing the parents were unable or unwilling to discharge their responsibilities to and for the children or that their conduct or condition rendered them unable to properly care for the children and that such conduct or condition was unlikely to change in the foreseeable future. Accordingly, we are compelled to reverse the judgments terminating the parents' rights to the children. The causes are remanded to the juvenile court for proceedings consistent with this opinion.
2060936 — REVERSED AND REMANDED.
2060937 — REVERSED AND REMANDED.
PITTMAN and BRYAN, JJ., concur in the result, without writings.
THOMPSON, P.J., concurs in the result only, without writing.
THOMAS, J., dissents, without writing.
[1] On July 9, 2007, the mother appealed the termination of her parental rights; that appeal was assigned case number 2060936. On July 10, 2007, the father appealed the termination of his parental rights; that appeal was assigned case number 2060937. By order dated August 9, 2007, this court consolidated the appeals.
[2] Sage testified that she recalled counseling the parents in 2004, but it is apparent from the rest of the record that Sage counseled the parents in 2005.
[3] The father also mentioned C.H., who Woods could not identify. C.H. never contacted DHR, and DHR never investigated C.H.
[4] The parents never tested positive for drugs. DHR never identified substance abuse as a problem for either parent. *Page 25