BRYAN, Judge.
T.G. (“the mother”) appeals a judgment terminating her parental rights regarding T.Ny.A.A., a girl born on May 30, 2005; T.Ny.G., a girl born on April 6, 2004; T.K.L.A., a girl born on February 21, 2003; and T.N.A., a girl born on January 21, 2002 (collectively referred to hereinafter as “the children”).[1] We affirm.
The record indicates the following. In August 2005, T.Ny.A.A. was airlifted to Children’s Hospital where she was diagnosed with skull and rib fractures, a frac *1184 tured leg, and retinal hemorrhaging. T.Ny.A.A. was also diagnosed with an older leg fracture that was healing. T.Ny. A.A. has subsequently been diagnosed with cerebral palsy and remains severely disabled as a result of these injuries.
On August 8, 2005, the Houston County Department of Human Resources (“DHR”) filed dependency petitions regarding the children. In addition to allegations of physical abuse regarding T.NyAA., DHR claimed that the children were being neglected because its investigation discovered that the children were dirty, with matted and dirty hair, and undiapered even though diapers were found in the house. Additionally, DHR’s investigation found that T.K.L.A. and T.N.A. required dental surgery because their teeth were rotted and infected. Neither the mother nor F.A., the father of several of the children, see note 1, supra, was criminally charged as a result of T.Ny.A.A.’s injuries; however, as a result of its investigation, DHR found that physical abuse was “indicated” with respect to the mother and F.A. and that medical neglect based on the mother’s “failure to follow through with [T.Ny.A.A.] being on her apnea monitor” was also “indicated.” The children were removed from their mother’s custody and placed together in foster care.
On May 22, 2007, DHR petitioned the juvenile court to terminate the parental rights of the mother and F.A. The juvenile court held an ore tenus hearing regarding DHR’s petitions on September 19, 2007.[2] At the hearing, the juvenile court heard testimony from the mother, from Susanna Oakley, the DHR caseworker assigned to this case, and from the children’s maternal grandmother. F.A. did not testify at the hearing, and he did not contest the termination of his parental rights as to T.Ny. A.A., T.K.L.A., and T.N.A. See note 1, supra. No person claiming to be the father of T.Ny.G. appeared at the hearing. Also, by the time of the hearing, the maternal grandmother and a maternal aunt had filed petitions for custody.[3] The maternal aunt, however, failed to appear at the hearing, and her petition for custody was dismissed.[4]
The testimony at the hearing established the following. The mother testified that on the evening that T.Ny.A.A. was injured, she had been out playing bingo and had left the children with F.A.[5] When the mother returned later that evening, she noticed a bruise on T.Ny.A.A.’s right cheek. The mother testified that she questioned F.A. about the bruise on T.Ny. A.A.’s cheek and that he responded by telling the mother “to go back where [she] came from.” The mother testified that she did not know if anything was wrong with T.Ny.A.A. that evening because T.NyAA. had previously experienced skin problems *1185 for which she was receiving medical treatment. The mother testified that the bruise on T.Ny.A.A.’s cheek appeared darker the following morning. The mother also testified that, when she would touch T.Ny.A.A., the child would “hurt” and “freeze up.” The mother further testified that she took T.Ny.A.A. to the hospital after determining that T.Ny.A.A.’s condition was worsening.
The mother testified that she did not know how T.Ny.A.A. had been injured, but she believed that F.A. had caused those injuries. The mother also testified that F.A. had told her three different stories regarding what had happened on the evening that T.Ny.A.A. was injured. The mother further testified that domestic violence had been “an issue” in her relationship with F.A. Additionally, the mother testified that she did not plan to continue her relationship with F.A. and that she would seek an order of protection against him and call the police if F.A. came around her or the children.[6]
On cross-examination, however, the mother testified that she had again become pregnant by F.A. after the incident in which T.Ny.A.A. had been injured while in his care. The mother also testified that she had continued an “off and on” romantic relationship with F.A. after T.Ny.A.A. had been injured.
The mother testified regarding her housing and employment. The mother testified that, at the time of the hearing, she was living in a two-bedroom apartment that she believed had adequate space for the children. The mother also testified that she had two jobs and worked from 10:00 a.m. until 11:00 p.m.; however, she did not testify as to the number of days she worked each week.[7] The mother admitted that she had been unemployed from November 2006 until March 2007 and that she had been unemployed for “the majority of the time” during the two years preceding the hearing. The mother further testified that the maternal grandmother would be willing and able to assist her with caring for the children while the mother was working.
The mother testified that she had been visiting the children at DHR’s facilities on a weekly basis for two hours each visit. The mother also testified that she had asked Oakley about regaining custody of the children. The mother further testified that DHR had not investigated her apartment; however, the mother admitted that she had not informed DHR of her latest address. Additionally, the mother testified that Oakley had informed her that her attorney would need to file a petition so that she could receive unsupervised visitation with the children; however, the mother admitted that she had never contacted her attorney regarding filing a petition to change her visitation status.
The mother testified regarding an Individualized Service Plan (“ISP”) that was dated August 11, 2005.[8] According to the mother’s testimony, that ISP indicated that DHR’s goal was to return the children to the mother’s custody. The mother testified that she had completed all the re *1186 quirements contained in that ISP. The mother also testified that she had complied with every request made by DHR and that she did not know of anything else that she needed to do in order to get her children back.
The maternal grandmother testified regarding her petition for custody of the children. The maternal grandmother testified that, at the time of the hearing, she had three children residing in her house. Two of the children residing in her house, a 15-year-old girl and a 17-year-old boy, were her own offspring. The mother and F.A. are the'parents of the other child, F.A., Jr., a 15-month-old boy.[9] She also testified that she resided with her husband, who suffered from emphysema. The maternal grandmother further testified that she was financially able to provide for the children; however, neither she nor her husband was employed at the time of the hearing, and they apparently survived on slightly more than $1,200 per month.[10] Additionally, the maternal grandmother testified that she had “an opportunity” to move back into a four-bedroom house in which she had previously resided; however, she was residing in a two-bedroom house at the time of the hearing.
The juvenile court questioned the maternal grandmother as to why she had waited until two years after DHR took custody of the children to file her custody petition. The maternal grandmother claimed that she had been trying to petition for custody but that “the Department of Family and Children” had “refused” to let her file a custody petition. She further claimed that DHR had provided her with “no help” in petitioning for custody of the children. The juvenile court also questioned the maternal grandmother regarding whether she had spoken with an attorney during the two years that the children had been in DHR’s custody. The maternal grandmother replied that she had attempted to hire an attorney but that she could not afford one.
Oakley testified that the juvenile court had ordered a home study on the maternal grandmother’s house after she had filed her custody petition. On Oakley’s recommendation, the maternal grandmother’s house was not approved. Oakley testified that the maternal grandmother’s house did not have adequate space for the children in addition to the other five people who already resided in the house.
Oakley testified that no person at DHR had told the maternal grandmother that she could not file a custody petition. Oakley also testified that she did not file a petition on behalf of the maternal grandmother because she could not have “back[ed] up ... and agree[d] with” her custody petition. Oakley further testified that the maternal grandmother had been dealing with a number of issues regarding her own children, including her 15-year-old daughter’s truancy and her 17-year-old son’s having been committed to the custody of the Department of Youth Services.
Oakley testified that DHR had determined that the maternal grandmother was not a possible placement for the children after they were removed from the mother’s custody. Oakley testified that DHR had made this determination because DHR did not know how T.Ny.A.A.’s injuries had occurred and the mother had been living *1187 with the maternal grandmother at that time. Oakley further testified that she believed that the maternal grandmother would be “taking on more than she could handle” if she was awarded custody of the children while also supporting her own children and F.A., Jr.
Oakley testified that F.A. had previously named the children’s paternal grandmother as a possible placement for the children. Oakley testified that the paternal grandmother’s house was evaluated and denied. Oakley also testified that the paternal grandmother had not visited the children or made any inquiries as to their well-being at any time since they had been placed in DHR’s custody. Oakley further testified that no other relatives from F.A.’s family had contacted DHR regarding the children. Additionally, Oakley testified that she had been contacted by Roosevelt Mitchell, who is the husband of the maternal grandmother’s sister. Mitchell informed Oakley that the maternal grandmother had contacted him regarding the children; however, Mitchell told Oakley that he was not interested in assuming custody of the children and could not take care of the children.
Oakley testified that DHR had not been able to reunite the children with the mother because she had “not shown any stability as far as a home.” Oakley testified that there had been times when she was not aware of the mother’s living arrangements and that she did not know where the mother was living at the time of the hearing. Oakley also testified that the children had not been returned to the mother because DHR did not know how T.Ny.A.A.’s injuries had occurred. Oakley further testified that the mother had “never been in a position where [DHR] felt like [it] could start reunification.” Additionally, Oakley testified that reunification was not possible because there existed “no stable home or parents to reunify [the children] to.”
Oakley testified that DHR had implemented ISPs with the mother and that the mother had not met certain requirements of those ISPs. Oakley testified that the mother had set a counseling appointment but had not followed through with it; however, Oakley testified that the mother had completed parenting classes. Additionally, Oakley testified that she did not know if the mother had her own house at the time of the hearing and that the mother had previously demonstrated instability regarding her housing. Furthermore, Oakley testified that, the day before the hearing, she had visited a house at which the mother had been residing. Oakley, while visiting that house, learned that the house was not owned by the mother; instead, Oakley determined that the house was owned by the maternal aunt’s son and that the mother had only recently begun residing there after previously residing with the maternal grandmother.
Oakley testified that DHR had continuing concerns regarding the incidents of domestic violence that were occurring between the mother and F.A. Oakley testified that the most recent incident had occurred in June 2007, at which time F.A. had stabbed the mother in her thigh with a fork. Oakley also testified that, despite the mother’s allegation that FA. was responsible for T.Ny.A.A.’s injuries and multiple incidents of domestic violence that had occurred between the mother and F.A., the mother and F.A. had continued their romantic relationship “off and on” during the more than two years since the children had been removed from the mother’s custody.
On September 20, 2007, the juvenile court entered a judgment terminating the mother’s parental rights as to the children. The mother timely appealed.
*1188 The mother raises two issues on appeal. First, the mother argues that insufficient evidence supports the juvenile court’s judgment terminating her parental rights. We disagree.
“ ‘In ore tenus proceedings, the trial court is the sole judge of the facts and of the credibility of the witnesses, and it should accept only that testimony which it considers worthy of belief.’ Clemons v. Clemons, 627 So.2d 431, 434 (Ala.Civ.App.1993).” Ex parte R.E.C., 899 So.2d 272, 279 (Ala.2004). Also,
“ ‘[t]he ore tenus rule provides that a trial court’s findings of fact based on oral testimony “have the effect of a jury’s verdict,” and that “[a] judgment, grounded on such findings, is accorded, on appeal, a presumption of correctness which will not be disturbed unless plainly erroneous or manifestly unjust.” Noland Co. v. Southern Dev. Co., 445 So.2d 266, 268 (Ala.1984).’ ”
Ex parte R.E.C., 899 So.2d at 279.
We are ever mindful that “[t]he paramount consideration in a case involving the termination of parental rights is the best interests of the children.” Q.F. v. Madison County Dep’t of Human Res., 891 So.2d 330, 335 (Ala.Civ.App.2004). However, “[t]he termination of parental rights is a drastic measure, and the courts gravely consider such action.” K.A.C. v. Jefferson County Dep’t of Human Res., 744 So.2d 938, 940 (Ala.Civ.App.1999)(cit-ing Ex parte Beasley, 564 So.2d 950 (Ala.1990)). Furthermore, “[t]he termination of parental rights is reserved for the most egregious of circumstances.” B.G. v. State Dep’t of Human Res., 875 So.2d 305, 308 (Ala.Civ.App.2003).
In Ex parte Beasley, supra, our supreme court stated:
“The two-prong test that a court must apply in a parental rights termination case brought by a custodial parent consists of the following: First, the court must find that there are grounds for the termination of parental rights, including, but not limited to, those specifically set forth in § 26-18-7[, Ala.Code 1975]. Second, after the court has found that there exist grounds to order the termination of parental rights, the court must inquire as to whether all viable alternatives to a termination of parental rights have been considered. (... [I]f a non-parent, including the State, is the petitioner, then such a petitioner must meet the further threshold proof of dependency.)”
564 So.2d at 954. Section 26-18-7, Ala. Code 1975, provides:
“(a) If the court finds from dear and convincing evidence, competent, material, and relevant in nature, that the parents of a child are unable or unwilling to discharge their responsibilities to and for the child, or that the conduct or condition of the parents is such as to render them unable to properly care for the child and that such conduct or condition is unlikely to change in the foreseeable future, it may terminate the parental rights of the parents. In determining whether or not the parents are unable or unwilling to discharge their responsibilities to and for the child, the court shall consider, and in cases of voluntary relinquishment of parental rights may consider, but not be limited to, the following:
“(1) That the parents have abandoned the child, provided that in such cases, proof shall not be required of reasonable efforts to prevent removal or reunite the child with the parents.
“(2) Emotional illness, mental illness or mental deficiency of the parent, or excessive use of alcohol or controlled substances, of such dura *1189 tion or nature as to render the parent unable to care for needs of the child.
“(3) That the parent has tortured, abused, cruelly beaten, or otherwise maltreated the child, or attempted to torture, abuse, cruelly beat, or otherwise maltreat the child, or the child is in clear and present danger of being thus tortured, abused, cruelly beaten, or otherwise maltreated as evidenced by such treatment of a sibling.
“(4) Conviction of and imprisonment for a felony.
“(5) Unexplained serious physical injury to the child under such circumstances as would indicate that such injuries resulted from the intentional conduct or willful neglect of the parent.
“(6) That reasonable efforts by the Department of Human Resources or licensed public or private child care agencies leading toward the rehabilitation of the parents have failed.
“(7) That the parent has been convicted by a court of competent jurisdiction of any of the following:
“a. Murder or voluntary manslaughter of another child of that parent.
“b. Aiding, abetting, attempting, conspiring, or soliciting to commit murder or voluntary manslaughter of another child of that parent.
“c. A felony assault or abuse which results in serious bodily injury to the surviving child or another child of that parent. The term ‘serious bodily injury’ means bodily injury which involves substantial risk of death, extreme physical pain, protracted and obvious disfigurement, or protracted loss or impairment of the function of a bodily member, organ, or mental faculty.
“(8) That parental rights to a sibling of the child have been involuntarily terminated.
“(b) Where a child is not in the physical custody of its parent or parents appointed by the court, the court, in addition to the foregoing, shall also consider, but is not limited to the following:
“(1) Failure by the parents to provide for the material needs of the child or to pay a reasonable portion of its support, where the parent is able to do so.
“(2) Failure by the parents to maintain regular visits with the child in accordance with a plan devised by the department, or any public or licensed private child care agency, and agreed to by the parent.
“(3) Failure by the parents to maintain consistent contact or communication with the child.
“(4) Lack of effort by the parent to adjust his or her circumstances to meet the needs of the child in accordance with agreements reached, including agreements reached with local departments of human resources or licensed child-placing agencies, in an administrative review or a judicial review.
“(c) In any case where the parents have abandoned a child and such abandonment continues for a period of four months next preceding the filing of the petition, such facts shall constitute a re-buttable presumption that the parents are unable or unwilling to act as parents. Nothing in this subsection is intended to prevent the filing of a petition in an abandonment case prior to the end of the four-month period.”
(Emphasis added.)
“Clear and convincing evidence” is “ ‘[ejvidence that, when weighed against evidence in opposition, will produce in the *1190 mind of the trier of fact a firm conviction as to each essential element of the claim and a high probability as to the correctness of the conclusion.’ ” L.M. v. D.D.F., 840 So.2d 171, 179 (Ala.Civ.App.2002) (quoting § 6 — 11—20(b)(4), Ala.Code 1975). We are ever cognizant that, as an appellate court, we cannot reweigh the evidence. However, as an appellate court, we must determine whether clear and convincing evidence supports the juvenile court’s conclusion that grounds exist warranting termination of the mother’s parental rights. See § 26-18-7.
In this case, the juvenile court found as grounds for the termination that the mother was unable or unwilling to discharge her parental responsibilities to and for the children, that the mother had not been able to provide for the physical, emotional, and financial needs of the children, and that the mother had not been willing or able to provide a stable home for the children.
Clear and convincing evidence supports the juvenile court’s judgment terminating the mother’s parental rights. A juvenile court must consider, among other things, instances of abuse and maltreatment of the children before terminating parental rights. § 26-18-7(a)(3), Ala.Code 1975. The juvenile court received undisputed evidence demonstrating that the children had been severely neglected while in the mother’s care. At the time that the children were removed from the mother’s custody by DHR, they were found to be dirty and undiapered, even though diapers were found in the house, and two of the children’s teeth had rotted to the extent that dental surgery was necessary. Furthermore, the juvenile court received evidence — in the form of the mother’s testimony — demonstrating that the mother had been physically abused by F.A. on numerous occasions and that F.A. had caused T.Ny.A.A.’s injuries. This evidence alone is sufficient to support the juvenile court’s determination that the mother was unable or unwilling to discharge her parental responsibilities to and for the children. See S.E. v. State Dep’t of Human Res., 862 So.2d 664, 674 (Ala.Civ.App.2003) (affirming the trial court’s judgment terminating the parental rights of the mother and the father when the evidence demonstrated, among other things, that the daughter had abscessed teeth and had never visited a dentist, that the daughter had come to school wearing undersized and soiled diapers, and that the father had physically abused the mother and the daughter).
Additionally, the evidence demonstrates that the mother had continued an “off and on” romantic relationship with F.A. despite the fact that T.Ny.A.A. had suffered crippling injuries while in F.A.’s care. The mother testified that she had not inflicted those injuries and that F.A. had offered three conflicting explanations as to what caused T.Ny.A.A.’s injuries. Furthermore, at the hearing, when asked if she believed that F.A. was responsible for T.Ny.A.A.’s injuries, the mother answered, “Yes, sir.... ” The mother testified that she would not continue her romantic relationship with F.A. after he was released from jail; however, the juvenile court was free to disbelieve that testimony. Although the evidence was controverted, apparently the juvenile court adopted the view of the evidence indicating that the mother would likely continue that relationship and thus subject the children to further physical abuse from F.A. if she regained custody. This evidence further supports the juvenile court’s determination that the mother was unable or unwilling to discharge her parental responsibilities to and for the children. Compare Odom v. State Dep’t of Human Res., 562 So.2d 522, 523-24 (Ala.Civ.App.1990) (affirming the *1191 trial court’s judgment denying the mother’s petition for a return of the custody of her children when the evidence demonstrated, among other things, that the mother intended to continue a relationship with her husband, who had allegedly sexually abused her children); Swain v. State ex rel. Alabama Dep’t of Pensions & Sec., 495 So.2d 1136, 1137 (Ala.Civ.App.1986) (affirming the trial court’s judgment that the child was dependent and awarding temporary custody to the Department of Pensions and Security based, in part, on evidence demonstrating that the mother’s paramour had physically abused the child and the mother had failed to protect the child from that abuse).
The mother next argues that the juvenile court erred in terminating her parental rights because, she alleges, the record does not contain sufficient evidence demonstrating that DHR used reasonable efforts toward rehabilitating the mother.
“This court has held that, in most cases, ‘DHR has the duty to make reasonable efforts to rehabilitate the [parent] so that family reunification might be attainable.’ C.B. v. State Dep’t of Human Res., 782 So.2d 781, 785 (Ala.Civ.App.1998).” J.P. v. S.S., 989 So.2d 591, 601 (Ala.Civ.App.2007). However, the record supports a conclusion that DHR made reasonable efforts to reunite the mother with the children and that the mother failed to make sufficient progress. The mother testified that she had complied with every request made by DHR; however, Oakley testified that the mother had not met certain requirements of the ISPs and that the mother had not demonstrated sufficient stability in her housing and employment that would allow reunification. Oakley testified that she had informed the mother that she “needed a stable environment” before the children could be returned to her custody. Oakley also testified that the mother had resided in several locations since DHR had taken custody of the children and that there had been times, including the period immediately preceding the hearing, when she had no knowledge of the mother’s living arrangements. The mother confirmed Oakley’s testimony by testifying that she had made no efforts to inform DHR of her most recent change in address, which had occurred on July 27, 2007.
Additionally, Oakley testified that DHR had set a goal for the mother to obtain and maintain employment. Although the mother had recently become employed on .March 13, 2007, Oakley testified that the mother had obtained employment only after “child support was pursued,” and the mother’s testimony demonstrates that she had been unemployed for the majority of the two years that the children had been in DHR’s custody. Oakley also testified that the mother had been “offered services but we were not in the position to reunify.” The juvenile court received evidence indicating that the mother, due to her lack of stable housing and employment, was still unable at the time of the hearing to provide a stable environment for the children. Furthermore, the evidence indicates that the mother’s progress toward achieving the goals for reunification was nothing more than the result of “last-minute efforts.” Therefore, the juvenile court could have concluded that DHR made reasonable efforts to reunite the mother with the children. See J.D. v. Cherokee County Dep’t of Human Res., 858 So.2d 274, 277 (Ala.Civ.App.2003) (affirming the trial court’s judgment terminating parental rights and noting that the mother’s progress towards reaching her reunification goals was the result of last-minute efforts).
Finally, the mother argues that there was not clear and convincing evidence supporting the juvenile court’s determination that no viable alternatives ex *1192 isted to termination of her parental rights. Specifically, the mother argues that the juvenile court erred in finding that awarding custody to the maternal grandmother was not a viable alternative to termination of her parental rights. We disagree with this argument as well.
The undisputed evidence before the juvenile court demonstrated that the maternal grandmother and her husband, at the time of the hearing, were unemployed and subsisted on an income of approximately $1,200 per month. The evidence also demonstrated that the maternal grandmother’s husband has emphysema and at times requires the use of an oxygen tank. The evidence further demonstrated that the maternal grandmother’s two teenaged children and her 15-month-old grandson were already residing with her and that she was living in a two-bedroom house, although she alleged that she had access to a four-bedroom house in which she had previously resided. Additionally, the juvenile court received evidence indicating that the maternal grandmother’s teenaged children had been getting into trouble and that the introduction into her house of four additional children, including one with severe disabilities, would be more than she could handle. Considering all these factors, we conclude that the juvenile court’s determination that awarding custody to the maternal grandmother was not a viable alternative to termination is supported by clear and convincing evidence. See M.H.J. v. State Dep’t of Human Res., 785 So.2d 372, 376 (Ala.Civ.App.2000) (affirming the trial court’s determination that awarding custody to the children’s grandmother was not a viable alternative to termination of parental rights based, in part, on her “minimal income, the crowded living conditions that would exist if custody of the children were awarded to her, and her own health problems”).
Based upon the record on appeal, we conclude that the juvenile court’s judgment terminating the parental rights of the mother is supported by clear and convincing evidence and is not plainly and palpably wrong. Thus, the juvenile court’s judgment terminating the parental rights of the mother is affirmed.
AFFIRMED.
THOMPSON, P.J., and PITTMAN and THOMAS, JJ., concur.
MOORE, J., dissents, with writing.

. F.A. was determined to be the father of each of the children except T.Ny.G. F.A.’s parental rights were terminated as to T.Ny.A.A., T.K.L.A., and T.N.A. F.A. is not a party to this appeal.

. The hearing was originally scheduled for August 14, 2007; however, the juvenile court continued the hearing until September 19, 2007, because F.A. appeared at the hearing without counsel and DHR requested that the juvenile court appoint counsel for F.A. before hearing its petition to terminate his parental rights.

. The maternal grandmother and the maternal aunt filed their petitions for custody of the children on August 14, 2007, more than two years after the children had been placed into foster care by DHR.

. The maternal aunt appeared before the juvenile court on August 14, 2007, the date that DHR's petitions were originally scheduled to be heard; however, the maternal aunt did not appear at the September 19, 2007, hearing.

. The record does not definitely establish the location at which F.A. was caring for the children that evening. The mother’s testimony appears to indicate that she left the children with F.A. at the maternal grandmother's house on the evening that T.Ny.A.A. was injured.

. F.A. was incarcerated at the time of the hearing on September 19, 2007. F.A. testified at the abbreviated August 14, 2007, hearing that he was in jail for "[fjake names and warrants, child support.”

. The mother allegedly was employed by "Motel 6” as a housekeeper, working from 10:00 a.m. until her housekeeping duties were completed. The mother later testified that she had a second job working at a factory from 3:00 p.m. until 11:00 p.m.

.Neither the August 11, 2005, ISP nor any of the other ISPs that DHR implemented with the mother are contained in the record.

. Upon his birth, F.A., Jr., was removed from the mother's custody and placed in the custody of the maternal grandmother. The mother's parental rights regarding F.A., Jr., were not at issue in this action.

. The record does not clearly indicate the source of their income.