DONALDSON, Judge.
S.S. (“the mother”) appeals from judgments of the Calhoun Juvenile Court (“the juvenile court”) terminating her parental rights to her children, H.S. and T.S. We affirm the juvenile court’s judgments.

Background

The mother has three children: H.S. (born in May 2005), T.S. (born in August 2007), and K.S. (born in November 2008) (“the three children”). P.H. (“the father”) is the father of H.S. and T.S. D.C. is the father of K.S. In September 2013, the mother was arrested on an outstanding warrant stemming from a shoplifting charge. Because the mother tested positive for methamphetamine and because there was no other caretaker for the three children, the Calhoun County Department of Human Resources (“DHR”) removed the three children from the mother’s custo *943 dy. On September 20, 2013, the juvenile court entered an order finding the three children to be dependent and placing them in the custody of DHR.
On June 2, 2015, DHR filed petitions to terminate the mother’s and the father’s parental rights to H.S. and T.S. (“the children”). Termination proceedings were also commenced as to the mother’s parental rights to K.S., but the record indicates that the juvenile court stayed those proceedings because K.S. had been placed with relatives of D.C. The juvenile court held a trial on the termination petitions regarding the children on September 17, 2015, at which it received the testimony of Tammy Deese, a child-abuse-investigation worker with DHR; Shay Bradford, a DHR social worker; Genice Civitello, a manager at Oxford Outreach, an entity that conducted a treatment program that the mother had attended; and the mother. The record reveals that the father’s written consent to the termination of his parental rights was filed with the juvenile court.
Deese testified that the mother was arrested in September 2013. Deese testified that the mother was incarcerated at the Jacksonville city jail after her arrest and that, at the time of her arrest, the mother tested positive for methamphetamine. Deese testified that, at that time, K.S. and H.S. were interviewed by the Children Advocacy Center and that they disclosed that they had been sexually abused by the mother’s former boyfriend, J.D., while the family was living with J.D. in Georgia. Deese testified that a child-abuse and neglect report was initially marked as indicated for inadequate supervision as to the mother; that, upon a record review requested by the mother, the indication as to the mother was overturned; but that the report remained indicated for the children being inadequately supervised without a specific finding of neglect against the mother.
Deese testified that she held an Individualized Service Plan (“ISP”) meeting with the mother at the Jacksonville city jail on September 20, 2013. The report for that ISP meeting, which was introduced into evidence at trial, shows that DHR set the following goals for the mother in order for her to be reunited with the three children: to undergo a drug assessment, to obtain and maintain a home free from drugs and abuse and with working utilities, and to find employment. The report also states that DHR would complete a referral to the Calhoun County Family Drug Court program for the mother so that, among other things, a drug assessment could be completed. Deese testified that she discussed these goals with the mother.
Deese testified that she supervised two or three visits between the mother and the three children in 2013, that “they appeared to be very close, very loving toward each other,” and that they “had good visits.” Deese testified that the three children were bonded with one another, that they were happy to see each other at visits, and that they were sad when the visits were over.
Deese testified that the three children were initially placed in foster care. K.S. eventually was placed with relatives of her father, D.C. Deese testified that the children are “very rambunctious” and that they can be hard to control. Deese testified that T.S. has been diagnosed with attention-deficit/hyperactivity disorder and that he has a serious speech impediment that affects his ability to communicate. Deese testified that DHR provided the three children counseling.
Bradford téstifíed that she was assigned these cases in July 2015. Bradford testified that the mother was incarcerated in the Calhoun County jail when she started working on the cases. She testified that no visitations between the mother and the *944 children had taken place since February 2015 because of the mother’s incarceration. Bradford testified that the mother was released from jail in September 2015, which was two weeks before the termination trial; that the mother contacted her a week after her release; and that the mother informed her that she was living at the facility of Oxford Outreach, which was conducting a rehabilitation program the mother was participating in. Bradford testified that the mother provided the name of the three children’s maternal grandmother as a possible relative resource for placement of the children but that the maternal grandmother had been ruled out as a resource because a previous child-abuse and neglect report had been indicated against her. Bradford testified that T.S. was placed at the Brewer Porch Center in Tuscaloosa in the summer of 2014. Bradford testified that the three children visit once a month at the Brewer Porch Center. Bradford testified that T.S. is receiving treatment from a psychiatrist, a counselor, and a speech therapist. She testified that T.S. had been in eight different placements. Bradford testified that H.S. has had seven different placements, that she was currently in a therapeutic foster home in Piedmont, and that she had been removed from her last placement because of behavioral problems. Bradford testified that the mother had not provided the children with any money or gifts since she had begun working on the cases. Bradford testified that the children have not asked about their mother at the visits they have with each other. Bradford testified that H.S. has expressed some “anger issues” regarding the mother and that visits between H.S. and the mother would not be in H.S.’s best interests. Bradford testified that she had not drug-tested the mother since her release from jail.
Bradford testified that, although there are no current identifiable adoptive resources for the children, she believes that the children are adoptable. She stated, however, that H.S.’s current foster parents have considered adopting H.S. Furthermore, she testified that the custodians of K.S., who are not relatives of the children, also indicated that they would take all three children if they could, but Bradford testified that KS.’s custodians did not want to go through the foster-parent certification process and that they had not filed a petition for custody of the children in the juvenile court. Bradford testified that H.S.’s foster parents and K.S.’s custodians are willing to allow weekend or overnight visits with the other children.
Civitello testified that the mother enrolled in the Oxford Outreach rehabilitation program two weeks before the trial. She testified that the mother had been living at Oxford Outreach’s facility and that the mother had been seeking employment. She testified that the mother just started a 12-step program. Civitello testified that the Oxford Outreach conducts a 12-month program, although the mother believed it to be a 6-month program. She testified that the mother was ordered by a criminal drug court to attend the program.
The mother testified that she was arrested on September 20, 2013, on a warrant for a shoplifting charge and that, at that time, she tested positive for methamphetamine. She testified that, as a result of that positive drug test, DHR referred her to an entity named New Directions for substance abuse counseling and that that entity instructed her that she needed to attend an inpatient rehabilitation program; however, the mother testified that she continued to use drugs. The mother testified that she did not complete the Calhoun County Family Drug Court program as was required by the September 2013 ISP meeting. The mother testified that she underwent a drug assessment, which took place in April 2014, and that she admitted *945 during the assessment that she had been taking methamphetamine for three years. The assessment recommended that the mother undergo inpatient drug treatment.
The mother testified that she was arrested in August 2014 on charges of possession of a controlled substance and drug paraphernalia. As a condition of her bail on those charges, the criminal court required the mother to attend an inpatient drug-rehabilitation program conducted by an entity named Starting Point. The mother testified that she participated in that program for five months but that she voluntarily left the program because she was unable to pay the $665 rent charged by Starting Point. She testified that she had attempted to work three jobs in order to pay the rent. Because she left the Starting Point program, the mother was arrested in February 2015 for violating the terms of her bail. The mother testified that she had remained incarcerated in the Calhoun County jail from February 28, 2015, to September 3, 2015.
The mother testified that K.S. and H.S. had reported that J.D., her former boyfriend with whom she and the three children had lived in Georgia, had sexually abused them. She stated that she had left the home she shared with J.D. Nonetheless, the mother admitted that she had allowed J.D. to participate in a visit with T.S. in April 2014.
The mother testified that she had provided DHR with the name of the children’s maternal grandmother when DHR inquired about possible relatives for placement of the children. The mother testified that she was unsure whether the maternal grandmother would be willing to serve as a potential placement for the children and that she and the maternal grandmother “barely ever talk” to one another.
The mother testified that she had been making progress in the two weeks she had been participating in the Oxford Outreach program. She testified that Oxford Outreach had been assisting her in finding employment as a waitress but that she was not currently employed. She testified that DHR had mentioned to her that another individual with whom she had lived had possibly sexually abused her children. She testified that she would never intentionally let her children around a person who sexually abused them, although she admitted to allowing J.D. to attend one of the visitations with T.S. in April 2014. Regarding her pending drug charges, the mother testified that she had entered into a plea agreement pursuant to which she would participate in a drug-court program for 18 months and attend a rehabilitation program for 6 months. The mother testified that she had made efforts to remain drug-free, that she had not completed any drug-rehabilitation program she had entered, and that she had not found a suitable residence.
The mother testified that she had brought the children Christmas presents that her church had helped her obtain. She testified that DHR had provided her with transportation to Tuscaloosa to visit T.S. She stated that DHR had paid for her to attend substance abuse counseling at New Directions. The mother testified that she had seen H.S. at church on a Sunday before the trial, that H.S. had hugged her, but that they had not talked. She stated that she believed that she and H.S. had a strong bond and that H.S. had been excited to see her.
At the conclusion of the trial, the juvenile court stated its findings in open court, including the following:
“That reasonable efforts have been made by [DHR] and they have failed to reunite. That there’s been no viable alternative presented to the Court as to the termination of parental rights, and that the Court, after considering the *946 evidence presented ore tenus as well as the evidence presented with documents entered into court lawfully, I find also considering Title 12-15-319 of the Code of Alabama and the grounds stated as well as for termination of parental rights as well as other grounds for termination of parental rights, I find that the mother and father’s parental rights should be terminated and that said termination is in the best interest of these two children.
“Therefore, this petition is sustained. Children are adjudicated dependent. The parental rights of the mother and father are hereby terminated. Permanent custody is hereby transferred to the [DHR] with the [DHR] having discretion in planning and placement.”
The juvenile court entered judgments on September 17, 2015, terminating the mother’s and the father’s parental rights to the children (“the September 17 judgments”).[1] The mother filed a motion to alter, amend, or vacate the judgments on September 30, 2015, in which she contended that termination of her parental rights is not in the best interests of the children, that DHR had failed to meet its burden of proof, that there are viable alternatives to the termination of her parental rights, and that the judgments were contrary to the law and the evidence. The juvenile court entered amended judgments on October 2, 2015 (“the October 2 judgments”), but the October 2 judgments indicate that they were rendered by the juvenile court on September 17.
The September 17 judgments and the October 2 judgments are virtually the same in format and content; they were completed on what appears to be a local form utilized by the juvenile court in termination-of-parental-rights cases. The September 17 judgments were completed by hand, and the October 2 judgments were completed electronically. A comparison of the September 17 judgments and the October 2 judgments reveals that the juvenile court omitted to check certain boxes or to otherwise fill in certain fields in the September 17 judgments that it checked or otherwise filled in in its October 2 judgments, including the following:
• In both cases, a box indicating waiver of court costs was not marked on the September 17 judgments but the check box was marked on the October 2 judgments.
• In the case relating to T.S., a date field concerning a court report was left blank in the September 17 judgment but was filled in to reflect a date of “7/10/2015” in the October 2 judgment. This date field was filled in by the juvenile court on the September 17 judgment entered in the case involving H.S.
• In both cases, the boxes in Paragraph 7 of the September 17 judgments, concerning whether DHR made reasonable efforts toward reuniting the mother and the child, were only partially marked in both cases. In the October 2 judgments, these check boxes were marked to clarify that the juvenile court found that DHR had made reasonable efforts toward reuniting the mother and the children but that DHR’s efforts had failed.
The mother filed notices of appeal to this court on October 23, 2015. This court consolidated the appeals ex mero motu. The children’s guardian ad litem filed a brief on appeal in support of the mother.

*947
Discussion

I. Timeliness of the Appeals
Neither party raises the issue of the timeliness of the appeals; however, an appellate court may consider the issue of subject-matter jurisdiction ex mero motu. C.J.L. v. M.W.B., 868 So.2d 451, 453 (Ala.Civ.App.2003). The record shows that the judgments terminating the mother’s parental rights were rendered by the juvenile court and entered into the State Judicial Information System on September 17, 2015. Two days after the mother filed the postjudgment motion to alter, amend, or vacate the judgments, the trial court electronically entered amended judgments.
We must determine whether, by entering the October 2 judgments, the juvenile court ruled on the mother’s post-judgment motion or whether it corrected or clarified the judgments pursuant to Rule 60(a), Ala. R. Civ. P.[2] If the former, then the mother’s postjudgment motion would have been ruled upon by the juvenile court on October 2 and the October 23, 2015, notices of appeal would be untimely pursuant to Rule 28, Ala. R. Juv. P. If the juvenile court’s October 2 judgments were within the scope of Rule 60(a), then the mother’s postjudgment motion would have remained pending until being denied by operation of law on October 14, 2015, pursuant to Rule 1(B), Ala. R. Juv. P.[3]
Our supreme court has stated:
“““The object of a judgment nunc pro tunc is not the rendering of a new judgment and the ascertainment and determination of new rights, but is one placing in proper form on the record, the judgment that had been previously rendered, to make it speak the truth, so as to make it show what the judicial action really was, not to correct judicial errors, such as to render a judgment which the court ought to have rendered, in the place of the one it did erroneously render, nor to supply non-action by the court, however erroneous the judgment may have been.’ ” ’ ”
Ex parte Brown, 963 So.2d 604, 608 (Ala.2007)(quoting Higgins v. Higgins, 952 So.2d 1144, 1147-48 (Ala.Civ.App.2006), quoting in turn Ex parte Continental Oil Co., 370 So.2d 953, 955-56 (Ala.1979)(Torbert, C.J., concurring specially), quoting in turn Wilmerding v. The Corbin Banking Co., 126 Ala. 268, 273, 28 So. 640, 641 (1900)).
In their appellate briefs, the mother and the guardian ad litem do not discuss the effect of the October 2 judgments. In its appellate brief, DHR contends that the October 2 judgments were entered to correct a “scrivener’s error.” We agree with DHR’s contention.
The October 2 judgments do not appear to be responsive to the mother’s post-judgment motion and they do not alter the effect of the September 17 judgments. Stated otherwise, the October 2 judgments did not involve the exercise of judicial discretion. It is evident from the record that the juvenile court’s entry of the October 2 judgments
“did not involve a reweighing of the evidence, a change of mind, or the rendering of a ‘different judgment.’ The trial court’s changes here involved corrections to make the record speak the truth. Because the trial court’s corrections did not involve judicial reasoning *948 or the rendering of a ‘different’ judgment, the trial court, pursuant to Rule 60(a), Ala. R. Civ. P., had the authority to correct and was thereby acting within its discretion in correcting the mechanical errors in its April 18, 2006, order by issuing the June 29, 2006, order.”
Ex parte Brown, 963 So.2d at 609 (footnote omitted). The October 2 judgments were rendered on the same day that the September 17 judgments were entered. The record establishes that the juvenile court, by entering the October 2 judgments, marked boxes on the form concerning waiver of court costs that it omitted to mark in the September 17 judgments. Also, in the October 2 judgment pertaining to H.S., the juvenile court filled in a date field that it omitted to fill in in the September 17 judgment. To the extent that the juvenile court altered the September 17 judgments to mark boxes relating to its findings of DHR’s reasonable efforts, the juvenile court was only clarifying that which it stated in open court at the conclusion of trial. Although a trial judge’s oral statements regarding the manner in which he or she intends to rule does not constitute a judgment, the juvenile-court judge’s statements in open court at the conclusion of trial in this case serve as “ ‘ “something in the record from which the mistake or error to be corrected may be gleaned,” ’ ” and “‘“the fact of mistake or error [is] supported by the record of the proceedings.” ’ ” Ex parte Brown, 963 So.2d at 608 (quoting Higgins, 962 So.2d at 1148, quoting in turn Continental Oil, 370 So.2d at 966 (Torbert, C.J., concurring specially)). The oral statements further establish the intent of the juvenile court to find that DHR made reasonable efforts, to find that those efforts failed to reunite the mother and the children, and to enter a judgment terminating the mother’s parental rights, among other things. Therefore, we conclude that the juvenile court entered the October 2 judgments to correct a scrivener’s error and to make the record speak the truth. We conclude that the entry of the October 2 judgments did not impact the mother’s postjudgment motion, that the postjudgment motion was denied by operation of law on October 14, 2016, and that the mother filed timely notices of appeal.
II. Grounds for Termination of Parental Rights
The mother first contends that DHR failed to prove by clear and convincing evidence that the mother is unable to discharge her responsibilities for the children and failed to show that her conduct is unlikely to change in the foreseeable future.
Section 12-15-319(a), Ala.Code 1975, provides, in part:
“(a) If the juvenile court finds from clear and convincing evidence, competent, material, and relevant in nature, that the parents of a child ape unable or unwilling to discharge their responsibilities to and for the child, or that the conduct or condition of the parents renders them unable to properly care for the child and that the conduct or condition is unlikely to change in the foreseeable future, it may terminate the parental rights of the parents. In determining whether or not the parents are unable or unwilling to discharge their responsibilities to and for the child and to terminate the parental rights, the juvenile court shall consider the following factors including, but not limited to, the following:
[[Image here]]
“(2) Emotional illness, mental illness, or mental deficiency of the parent, or excessive use of alcohol or controlled substances, of a duration or nature as to render the parent unable to care for needs of the child.
*949 [[Image here]]
“(7) That reasonable efforts by the Department of Human Resources or licensed public or private child care agencies leading toward the rehabilitation of the parents have failed.
[[Image here]]
“(9) Failure by the parents to provide for the material needs of the child or .to pay a reasonable portion of support of the child, where the parent is able to do so.
[[Image here]]
“(12) Lack of effort by the parent to adjust his or her circumstances to meet the needs of the child in accordance with agreements reached, including agreements reached with local departments of human resources or licensed child-placing agencies, in an administrative review or a judicial review.”
This court has explained:
“A juvenile court is required to apply a two-pronged test in determining whether to terminate parental rights: (1) clear and convincing evidence must support a finding that the child is dependent; and (2) the court must properly consider and reject all viable alternatives to a termination of parental rights.”
B.M. v. State, 895 So.2d 319, 331 (Ala.Civ.App.2004) (citing Ex parte Beasley, 564 So.2d 950, 954 (Ala.1990)). The appellate courts must apply a presumption of correctness in favor of the juvenile court’s findings in a termination-of-parental-rights action. J.C. v. State Dep’t of Human Res., 986 So.2d 1172, 1183 (Ala.Civ.App.2007). “Additionally, we will reverse a juvenile court’s judgment terminating parental rights only if the record shows that the judgment is not supported by clear and convincing evidence.” Id. See Ex parte McInish, 47 So.3d 767, 774 (Ala.2008)(explaining standard of review of judgment resting upon factual determinations required to be based on clear and convincing evidence).
The mother contends that DHR faded to present clear and convincing evidence that she engaged in excessive use of controlled substances “of a duration or nature as to render [her] unable to care for needs of the children].” § 12-15-319(a)(2). The mother, however, admitted that she continued to abuse methamphetamine after DHR removed the children from her custody. In August 2014, nearly a year after the children had been removed from her custody, the mother was arrested on drug charges. Although the mother’s recent attempt at rehabilitation is commendable, at the time of the termination trial the children had been in DHR’s custody for two years and the mother had not completed a drug-rehabili-tatio'n program. Attending the Starting Point program was a requirement of her bail on her criminal charges. The record shows that the mother voluntarily quit the Starting Point program, which resulted in her arrest and incarceration for six months. As this court has previously recognized, *“[i]n deciding to terminate parental rights, a trial court may consider the past history of the family as well as the evidence pertaining to current conditions.’” A.R. v. State Dep’t of Human Res., 992 So.2d 748, 760 (Ala.Civ.App.2008) (quoting T.B. v. Lauderdale Cty. Dep’t of Human Res., 920 So.2d 565, 570 (Ala.Civ.App.2005)). Additionally, although the mother had enrolled in the Oxford Outreach program, she had participated in that program for only two weeks prior to the termination trial. The juvenile court was within its discretion to determine that, “to the. extent the mother may have allegedly improved her condition, those efforts were merely last-minute efforts undertaken in anticipation of the impending termination-of-parental-rights trial.” A.M.F. v. *950 Tuscaloosa Cty. Dep’t of Human Res., 75 So.3d 1206, 1213 (Ala.Civ.App.2011) (citing J.D. v. Cherokee Cty. Dep’t of Human Res., 858 So.2d 274, 277 (Ala.Civ.App.2003)).
Furthermore, although the mother had not been convicted of the criminal charges arising from her August 2014 arrest, she had entered into a plea agreement involving a deferred-prosecution arrangement pursuant to which she was required by the criminal court to complete an 18-month drug-court program. Thus, at the time of the termination trial, the criminal charges remained pending, and further incarceration of the mother in the event she failed to abide by the terms of the plea agreement remained a possibility.
As a part of the reunification plan set out by DHR in the September 2013 ISP report, the mother was required to achieve sobriety, maintain employment, and maintain a stable home free from drugs and with working utilities. At trial, the mother admitted that she did not have a house, that the children would not be able to live with her at the Oxford Outreach facility, and that she was not currently capable of receiving physical custody of the children. She also testified that, despite efforts to find employment, she was not employed. In its discretion, the juvenile court could have determined that the mother failed to make a consistent effort to meet the goals set forth by DHR. The juvenile court could have properly determined that the mother showed a “[ljack of effort ... to adjust ... her circumstances to meet the needs of the child[ren] in accordance with” the September 2013 ISP. § 12-15-319(a)(12); see also J.S. v. St. Clair Cty. Dep’t of Human Res., 969 So.2d 918, 923 (Ala.Civ.App.2007)(hold-ing that the juvenile court correctly determined that the mother had failed to make a consistent effort to meet the goals set forth by DHR).
The mother contends that DHR failed to make reasonable efforts to assist her in rehabilitating herself so that she could be reunited with the children. The mother contends that DHR offered the mother no counseling and no transportation. The testimony, however, reveals that DHR held 10 ISP meetings, that DHR established a list of goals for the mother to reach, that DHR referred the mother to the Calhoun County Family Drug Court Program, that DHR provided the mother with a drug assessment that the mother did not complete until April 2014, that DHR paid for the mother’s substance abuse counseling at New Directions, that DHR provided the children with counseling, that DHR provided the mother with visitation, and that DHR provided the mother with transportation to visits. The record supports a conclusion that DHR did make reasonable efforts to reunite the mother with the children and that the mother did not make sufficient progress. See J.P. v. S.S., 989 So.2d 591, 601 (Ala.Civ.App.2008)(holding that the juvenile court could have concluded that DHR had made reasonable efforts to reunite the father with the child).
The juvenile court could have also been concerned by the mother’s continued relationship with J.D., her former boyfriend. The mother admitted that she was aware that K.S. and H.S. had disclosed that J.D. had sexually abused them. Despite being aware of those allegations, the mother continued to communicate with J.D. The mother even allowed J.D. to accompany her on a visit with T.S. Based on the evidence indicating that the mother continued to involve J.D. in her life and to allow him around the children, the juvenile court could have determined that the mother’s conduct or condition rendered her unable to properly care for the children. See T.G. v. Houston Cty. Dep’t of Human Res., 6 So.3d 1182, 1190 (Ala.Civ.App.2008)(hold- *951 ing that the juvenile court could have adopted a view of the evidence that the mother would likely continue that relationship with the person who had abused the children and thus subject the children to further physical abuse if she regained custody).
As this court stated in B.J.KA. v. Cleburne County Department of Human Resources, 28 So.3d 765, 771 (Ala.Civ.App.2009):
“As the main opinion in H.H. [v. Baldwin County Department of Human Resources, 989 So.2d 1094 (Ala.Civ.App.2007)(opinion on return to remand) ] recognized, ‘ “[a]t some point, however, the child’s need for permanency and stability must overcome the parent’s good-faith but unsuccessful attempts to become a. suitable parent.”’ Id. at 1105 n. 5. (quoting M.W. v. Houston County Dep’t of Human Res., 773 So.2d 484, 487 (Ala.Civ.App.2000)). This case is rather like D.G. v. State Department of Human Resources, 569 So.2d 400 (Ala.Civ.App.1990), in which the mother’s two children had been in and out of foster care over a five-year period. As aptly stated by this court, ‘[a]t some point it becomes necessary to say that the children require a more permanent placement.’ D.G., 569 So.2d at 403. More recently, in M.A.J. v. S.F., 994 So.2d 280, 291 (Ala.Civ.App.2008), this court held that the 12-month period between foster-care placement and the 12-month permanency hearing required by former Ala.Code 1975, § 12-15-62(c), is sufficient time within which the parents may ‘prove that their conduct, condition, or circumstances have improved so that reunification may be promptly achieved.’ In M.A.J., we further held that the circumstances of a. particular case should dictate the length of the rehabilitation period allowed a particular parent. M.A.J., 994 So.2d at 291 (quoting Talladega County Dep’t of Human Res. v. M.E.P., 975 So.2d 370, 374 (Ala.Civ.App.2007)) (‘ “[T]he point at which the child’s needs overcome the parent’s right to be rehabilitated must be determined based on the facts of each individual case.” ’),”
These proceedings were conducted before the trial judge, who is- charged with the duty and responsibility of resolving disputed issues of fact by weighing the evidence and, when appropriate, assessing the credibility of the witnesses. An appellate court defers to the findings of the trial court on such matters.
“Because appellate courts do not weigh evidence, particularly when ‘the assessment of the credibility of witnesses is involved,’ Knight [v. Beverly Health Care Bay Manor Health Care Ctr.], 820 So.2d [92] at 102 [ (Ala.2001) ], we defer to the trial court’s factual findings. ‘The ore tenus rule reflects this deference; it accords a presumption of correctness to the trial court’s findings because of that court’s unique ability to observe the demeanor of witnesses.’ Id.; see also Fitzgerald v. Jeter, 428 So.2d 84, 85 (Ala.Civ.App.1983), and Ex parte Fann, 810 So.2d 631, 633 (Ala.2001).”
J.C. v. State Dep’t of Human Res., 986 So.2d at 1185.
Sufficient evidence exists in the record for the juvenile court to have determined that DHR had expended an adequate amount of time and effort to assist the mother in rehabilitating herself but that further time and effort would not help achieve the goal of family reunification in light of the mother’s lack of progress over a two-year period. See B.J.KA., 28 So.3d at 771 (citing M.A.J. v. S.F., 994 So.2d 280, 292 (Ala.Civ.App.2008)).
III. Viable Alternatives
The mother and the guardian ad litem contend that there were viable alternatives to termination of the mother’s parental rights.
*952 “If the trial court determines, based on all relevant factors, that grounds exist for terminating parental rights, then the court must proceed to the second part of its analysis, which is to consider whether all viable alternatives to terminating parental rights have been exhausted.”
Ex parte J.E., 1 So.3d 1002, 1008 (Ala.2008)(citing Ex parte Beasley, 564 So.2d at 954). The determination of whether a viable alternative to termination of parental rights exists is a question of fact. J.B. v. Cleburne Cty. Dep’t of Human Res., 991 So.2d 273, 283 (Ala.Civ.App.2008).
The mother contends that the juvenile court erred in terminating her parental rights in lieu of maintaining the status quo. The mother contends that she and the children share a strong emotional bond and each child’s current placement or custody arrangement alleviates any concerns regarding the mother.
“ ‘This court has consistently held that the existence of evidence of current conditions or conduct relating to a parent’s inability or unwillingness to care for his or her children is implicit in the requirement that termination of parental rights be based on clear and convincing evidence.’ D.O. v. Calhoun Cty. Dep’t of Human Res., 859 So.2d 439, 444 (Ala.Civ.App.2003). However, ‘ “[i]n deciding to terminate parental rights, a trial court may consider the past history of the family as well as the evidence pertaining to current conditions.” ’ A.R. v. State Dep’t of Human Res., 992 So.2d 748, 760 (Ala.Civ.App.2008) (quoting T.B. v. Lauderdale Cty. Dep’t of Human Res., 920 So.2d 565, 570 (Ala.Civ.App.2005)).”
C.P. v. Cullman Cty. Dep’t of Human Res., [Ms. 2140933, Feb. 26, 2016] 203 So.3d 1261, 1269 (Ala.Civ.App.2016).
The mother contends that the juvenile court received evidence establishing that a strong bond exists between her and the children and that she has made drastic efforts to improve her circumstances. As noted above, however, the record would support the juvenile court’s conclusion that the mother is currently unable and unwilling to discharge her responsibilities for the children. Deese testified that the mother and the children appeared to have a bond, but her observations were limited to visits that occurred in 2013 shortly after the children entered DHR’s custody. The juvenile court heard Bradford’s testimony that the children did not talk about or ask about the mother. It ■ also heard Bradford’s testimony that H.S. exhibited “anger issues” regarding the mother. The juvenile court, therefore, received conflicting evidence concerning the existence of a strong emotional bond. The juvenile court, as the trier of fact, is in the best position to resolve conflicts in the evidence. See D.C.S. v. L.B., 84 So.3d 954, 962 (Ala.Civ.App.2011) (“The trier of fact, and not this court, has the duty of resolving conflicts in the evidence.”). Furthermore, “[t]his court has held that maintaining a child in foster care indefinitely while a parent attempts to rehabilitate himself or herself is not a viable alternative to the termination of parental rights.” A.H. v. Houston Cty. Dep’t of Human Res., 122 So.3d 846, 851 (Ala.Civ.App.2013).
The mother and the guardian ad litem contend that DHR presented no evidence to show that the maternal grandmother’s current circumstances disqualified her from serving as a relative placement of the children. However, the mother testified that she was not sure if the maternal grandmother would be willing to serve as a placement for the children. The mother further testified that she and the maternal grandmother “barely ever talk.” Furthermore, the mother testified that the mater *953 nal grandmother did not raise her and that, instead, she was raised by her own grandmother. Additionally, the evidence showed that the maternal grandmother had a been indicated for child abuse and neglect and that, because of that report, the maternal grandmother had been ruled out as a relative resource. Furthermore, the maternal grandmother never came forward as a relative resource. See M.J.C. v. G.R.W., 69 So.3d 197, 209 (Ala.Civ.App. 2011)(“K.W.’s testimony at trial that no relatives of the parents had come forward in the four years since the child’s birth to offer to take custody of him was sufficient to support the juvenile court’s conclusion that no other viable alternative to termination of the parents’ parental rights existed.”).
Although Bradford testified that the children were adoptable and that there were potential adoptive resources, the mother contends that DHR failed to present evidence of an identifiable adoptive resource. However, “the lack of an identified adoptive resource does not necessarily preclude termination of parental rights.” T.L.S. v. Lauderdale Cty. Dep’t of Human Res., 119 So.3d 431, 439 (Ala.Civ.App.2013).
The mother and the guardian ad litem also contend that placing the children with the custodians of K.S. was also a viable alternative to termination of the mother’s parental rights. The custodians of K.S., however, are not relatives of the children or of the mother. Although the custodians expressed interest to DHR in receiving custody of the children, they did not want to go through the foster-parent certification process and they did not file a petition for custody of the children.
Based on the applicable standard of review, we conclude that there is evidence in the record that the juvenile court could have found to be clear and convincing so as to support the juvenile court’s conclusion that there were no viable alternatives to the termination of the mother’s parental rights.
IV. Best Interests
The mother and the guardian ad litem argue that the termination of the mother’s parental rights is not in the best interests of the children. “We are ever mindful that ‘[t]he paramount consideration in a case involving the termination of parental rights is the best interests of the children.’” T.G. v. Houston Cty. Dep’t of Human Res., 6 So.3d 1182, 1188 (Ala.Civ.App.2008)(quoting Q.F. v. Madison Cty. Dep’t of Human Res., 891 So.2d 330, 335 (Ala.Civ.App.2004)). “DHR may file a termination petition whenever it determines that the best interests of the child would be served thereby.” T.G. v. Houston Cty. Dep’t of Human Res., 39 So.3d 1146, 1150 (Ala.Civ.App.2009).
The mother and the guardian ad litem contend that it would not be in the children’s best interests to never see the mother again when there is not an identifiable adoptive resource. They cite the evidence discussed above concerning the emotional attachment between the mother and the children. They also contend that the mother had shown progress toward rehabilitation. Additionally, they contend that it would not be in the children’s best interests to not maintain a relationship with their siblings.
The juvenile court could have been convinced that termination was in the best interests of the children because the mother failed to complete drug rehabilitation after two years. The juvenile court could have concluded that the mother’s actions and her failure to take advantage of DHR’s reasonable efforts resulted in the children’s continuation in foster care. The juvenile court also received evidence indicating that the foster parents of H.S. and the custodians of K.S. recognized the need *954 of the three children to maintain contact and to maintain a relationship after termination of the mother’s parental rights. Furthermore, the mother had been incarcerated for 6 months shortly before the termination trial and had not visited the children during that time. The juvenile court heard evidence that the children did not talk about or ask about the mother. The juvenile court could have determined that there was not a strong emotional bond between the mother and the children. Thus, the juvenile court properly exercised its discretion, based on clear and convincing evidence, to enter the judgments terminating the mother’s parental rights to the children. Based on the applicable standard of appellate review that governs our consideration of this case, the evidence reasonably could have produced in the mind of the juvenile-court judge a firm conviction as to each essential element of DHR’s claims and a high probability as to the correctness of the juvenile court’s conclusion that the children’s best interests would be served by the termination of the mother’s parental rights.

Conclusion

For the forgoing reasons, the juvenile court’s judgments terminating the mother’s parental rights to the children are affirmed.
2150093—AFFIRMED.
2150094—AFFIRMED.
THOMPSON, P.J., and PITTMAN and THOMAS, JJ., concur.
MOORE, J,, concurs in the result, without writing.

. As noted, the father consented to the termination of his rights, and he did not appeal the juvenile court's judgments.

. Rule 60(a) provides that ‘'[cjlerical mistakes in judgments, orders, or other parts of the record and errors therein arising from oversight or omission may be corrected by the court at any time of its own initiative....”

. “The amendment [to correct a clerical error pursuant to Rule 60(a) ] relates back to the original judgment and becomes a part of it.” Bergen-Patterson, Inc. v. Naylor, 701 So.2d 826, 829 (Ala.Civ.App.1997).